In the Matter of the Application of WILLIAM C. BRIDGMAN and Others, Petitioners, Appellants, for an Order Pursuant to Article 78 of the Civil Practice Act, against PAUL J. KERN, President, and Others, Members, Together Constituting the Municipal Civil Service Commission of the City of New York, and JOSEPH D. McGOLDRICK, Comptroller of the City of New York, and JOSEPH JABLONOWER, Respondents.

First Department, June 29, 1939.

*Albert B. Breslow* of counsel [*Herman D. Mines* with him on the brief], for the appellants.

*Robert H. Schaffer* of counsel [*Paxton Blair* with him on the brief; *William C. Chanler, Corporation Counsel*, attorney], for the

respondents Municipal Civil Service Commission and the Comptroller of the City of New York.

*Herbert A. Wolff* of counsel [*Justin N. Reinhardt* with him on the brief], for the respondent Jablonower.

CALLAHAN, J. The municipal civil service commission in January, 1937, published a notice of an examination to be held for the position of " Examiner, Board of Education " of the city of New York. The position is classified in the competitive class of the civil service. As stated by respondents in their brief: " *The position is one of the most important educational positions in the United States.*" The duties of the position are to examine all applicants for a license to teach in the public schools of the city of New York, except examiners, and to prepare all necessary eligible lists for such teaching and other positions connected with the schools.

The subjects and weights of the proposed examination were advertised as follows:

Experience, weight 4, seventy per cent required.

Written test, weight 4, seventy-five per cent required; sixty-five per cent on each part.

Technical-oral, weight 2, seventy per cent required; sixty per cent on each factor listed.

General average required, seventy-five per cent.

Eighty-eight candidates who met the preliminary requirements were declared eligible to participate in the written examination. Sixty-one of such candidates actually participated in, and twenty-nine candidates passed the written examination, among them being the petitioners with ratings as follows:

|  | Per cent. |
|---|---|
| Edith M. Ward | 88.39 |
| Edmund J. Gannon | 87.50 |
| Letitia Raubicheck | 87.28 |
| Samuel D. Moskowitz | 86.83 |
| C. Frederick Pertsch | 82.81 |
| Abraham Kroll | 79.02 |
| William C. Bridgman | 77.23 |

The respondent Jablonower also succeeded in the written examination with a rating of seventy-five and sixty-seven one-hundredths per cent. He was twenty-eighth on the list of twenty-nine persons. It is alleged that respondent Jablonower received a passing mark only after the ratings had been " rescaled " upward. Petitioners were never rated for their experience, but it is conceded

that if they had been they would have received passing marks. The petitioners, for many years, have held important supervisory or executive positions in the school system of the city of New York. The respondent Jablonower at one time had been a teacher in the city school system, but since the year 1919 was employed as a teacher in a private school.

The twenty-nine candidates who survived the written examination were called for the oral test. Twenty-eight out of the twenty-nine failed. Although there were at the time two vacancies for the position, respondent Jablonower was the only candidate the examiners passed in the oral test. An eligible list consisting only of Jablonower's name was promulgated, and he has been appointed to fill one of the vacant positions. Subsequently a new examination was announced to fill the remaining vacancy and a new board of examiners selected to give the test.

This litigation is concerned with the manner of conducting the technical-oral test and the ratings thereunder. The technical-oral test was divided into two parts. Part I was intended to test the technical competence of the candidate, and to this part a weight of " 1 " was assigned. It was conducted before a group of three educators. Of the twenty-nine candidates who participated in part I, sixteen, including the petitioners and the respondent Jablonower, survived. The qualifying mark for this part was sixty per cent. In the directions to the panel of examiners on part I, the examiners received *inter alia* the following instructions:

" Candidates will not be rated on a man-to-man scale. * * * In order to consider *changing needs in education, examiners should fail not less than about one-half the total group of candidates* * * *." (Emphasis mine.)

" Unacceptable candidates should be given ratings below 60%. Ratings between 60% and 75% should be given to candidates whose technical competence is only very slightly below that of a high grade examiner. Ratings above 75% should be given to candidates who undoubtedly possess high technical competence as defined in this part of the examination."

" (5) After the candidate leaves, each examiner will record an initial rating for each of the two factors. The average of the ratings on the two factors will constitute the examiner's tentative rating of the candidate. These initial ratings are independent evaluations and will be made by examiners without consultation with any other member of the panel.

" (6) Each examiner will then read aloud the three tentative ratings he has recorded.

" (7) Discussion of the ratings will then ensue. It is the purpose of this discussion to present to all members of the panel such data as are noted by individual examiners. The presentation of these data may lead examiners to adjust initial ratings. Though adjustment of ratings is not obligatory, discussion of ratings may induce one or more examiners to change tentative ratings. Ratings following discussion are final for each examiner."

The instruction, to " fail not less than about one-half the total group of candidates," was illegal. In effect it told the panel of examiners that, irrespective of how many candidates, in their judgment, should justly be rated above the passing mark, no more than one-half of the competing candidates were to be passed. Such direction was clearly improper when a passing mark was established. The passing mark might be made as high as the circumstances justified. That would be a different matter from directing compulsory failure of a definite percentage of candidates, irrespective of the mark they actually received or to which they were entitled. For example, if it should appear to the panel examiners that all candidates were above the passing mark, there would be no proper basis upon which one-half of the candidates might be failed, unless the passing mark was changed. While it appears that all of the petitioners passed the technical oral test and, accordingly, may not have been aggrieved by the instructions given, it is not certain that others who failed this half of the test were not aggrieved thereby.

It is charged by the petitioners, but denied by the respondents, that employees of the municipal civil service commission compelled members of the examining panel to lower marks given to some of the candidates. On part I, the respondent Jablonower was rated at seventy-five and eight-tenths per cent and the petitioners were rated as follows:

| | Per cent. |
|---|---|
| Kroll | 74.2 |
| Raubicheck | 65. |
| Ward | 62.5 |
| Moskowitz | 62.5 |
| Gannon | 60.08 |
| Pertsch | 60. |
| Bridgman | 60. |

The instructions provided that ratings between sixty per cent and seventy-five per cent should be given to candidates whose technical competence was only slightly below that of a high grade examiner, and that ratings above seventy-five per cent should be given to candidates who possessed high technical competence. These

instructions would appear to be misleading, in that they failed to show that sixty per cent was the passing mark. In any event these instructions indicated a preconceived plan to keep the number of successful candidates down to a minimum.

Section 14 of the Civil Service Law of the State of New York provides that the competitive class of the civil service shall include all positions for which it is practicable to determine the merit and fitness of applicants by competitive examination, and that the term of eligibility shall be fixed for each eligible list at not less than one or more than four years. Section 871 of the Education Law reads, in part, as follows: " An eligible list of candidates for appointment as member of the board of examiners shall remain in force for four years from the date of its promulgation. Prior to the expiration of said list, the board of education may request the Civil Service Commission * * * to continue said list for a period of two years, and said Civil Service Commission shall grant such request. Said Civil Service Commission may, upon like request * * * continue said list for a further period of two years."

Any preconceived plan to establish a list no larger in size than the number of vacancies presently existing, for the purpose of controlling the filling of existing vacancies, is contrary to law. When the intention of the Legislature is clearly expressed it is not within the discretion of an administrative body, no matter how " progressive," to substitute its own views in place of the legislative mandate. Observance of this law saves the taxpayers the burden of the cost of unnecessary examinations and preserves the fundamental principles of civil service. An examination deliberately devised to eliminate all but one or two candidates means that form only is being observed, while the substance of the law is being ignored. Furthermore, it in effect is a curtailment of the right of the appointing body to select from those certified from an appropriate list.

The civil service commission may not interfere with the powers of the appointing body by intentional curtailment of the list. (*People ex rel. Balcom* v. *Mosher*, 163 N. Y. 32.)

That it was the intention of the civil service commission in this case to limit the size of the list of successful candidates to one or two was conceded in a remark made by the president of the commission in a public address delivered shortly after this examination was held. As that address is reported in an exhibit which the president attaches to his answering affidavit, he said: " I do not say that the individuals who came to the final orals were unqualified. I say that there were only two jobs to fill. The examiners did not

appraise them on a relative basis, but were to select the top one or two — and that they did. The choice of Jablonower was that type of choice."

The instructions given concerning the oral examination were illegal in another respect. Rule V, section V, paragraph 1 of the Municipal Civil Service Commission Rules reads, in part, as follows:

" 1. Each subject shall be rated by two examiners acting separately. They shall then affix to each paper a mark expressing the average of their judgment, attested by their respective signatures or initials."

In the instructions given to the examiners here they were directed to prepare tentative ratings and to then consult with a view to adjustment of initial ratings. Such instructions are not consistent with the rule. One result of the instructions is that an examiner rated a candidate ninety per cent for judgment, and after consultation with his fellow-examiners reduced the rating to sixty per cent. If examiners are influenced, controlled or dominated by other members of the panel, or by employees of the commission, there is no separate appraisement, as the rule requires. The evil of such a course is apparent when comparison of tentative and final rating sheets discloses many striking changes in ratings made, presumably after consultation. We do not find that the point was raised in *Matter of Snyder* v. *Finegan* (253 App. Div. 707; affd., 278 N. Y. 665).

We think that part I was improper in the respects indicated.

Part II of the technical-oral test was intended to evaluate and rate candidates on their judgment, clearness and quickness of comprehension, appearance, manner and speech. A total weight of " 1 " was allowed for part II of the technical-oral test with the following value for the factors listed:

| | |
|---|---|
| Judgment | (.35) |
| Clearness and quickness of comprehension | (.15) |
| Appearance | (.10) |
| Manner | (.30) |
| Speech | (.10) |

There were five members of the panel conducting the examination for part II, two of whom had been members of the panel conducting the examination on part I. Of the sixteen candidates who participated in this final examination, all were failed with the exception of Jablonower.

It is charged, among other things, that part II of the technical-oral examination did not relate to those matters which would fairly test the fitness of a candidate for the duties of the position;

that the municipal civil service commission failed to set up standards by which the quality of the various factors of the candidates' personalities pertaining to the duties of the position could be objectively measured and that part II was so designed, through guarded but carefully worded questions, as to elicit the political, social and economic philosophy or ideology of the candidates, rather than their competence or incompetence for the position in question.

Part II of the technical-oral examination was concerned with the "personality" of the candidate. Speaking of such tests, the Court of Appeals said, in *Matter of Fink* v. *Finegan* (270 N. Y. 356): "A test or examination, to be competitive, must employ an objective standard or measure. Where the standard or measure is wholly subjective to the examiners it differs in effect in no respect from an uncontrolled opinion of the examiners and cannot be termed competitive. * * * An examination cannot be classed as competitive unless it conforms to measures or standards which are sufficiently objective to be capable of being challenged and reviewed, when necessary, by other examiners of equal ability and experience."

Speaking of the nature of the examination in the *Fink* case, in *Matter of Sloat* v. *Board of Examiners* (274 N. Y. 367) the court said:

"There was no contention that the oral examination constituted, or was used as, a test of the possession of such qualities. It was, so far as appeared, devised and used merely as an opportunity for appraisal by the examiners of the candidates' personality and such appraisal rested so far as appears upon the unfettered judgment of the examiners. Their judgment may have been good, their fairness was not challenged. The authority conferred upon them by law was, however, limited to the ascertainment of merit and fitness by examination which so far as practicable shall be competitive and we were constrained to hold that the record did not disclose that the oral test constituted such examination. * * *

"The mandate of the Constitution for the ascertainment of merit and fitness, so far as practicable, by competitive examination, may not be transformed into an interdict against the examinations which are best adapted for the demonstration of fitness. It would be impossible to formulate a standard by which such qualities may be defined or measured with entire objectivity. The law does not require the impossible or forbid the reasonable. The record discloses that here the examiners have based determination upon their estimates of qualities which, it is reasonably clear,

affect the merit and fitness of a teacher and that this estimate is derived from tests calculated reasonably to show those qualities. Evidently it is not practicable to apply such tests in exactly the same form to each competitor or to make exact comparisons between them. That is true in some degree of every examination, especially of examinations calculated to show intellectual ability and broad cultural learning. Exact definition of the qualities which are essential or desirable may be impossible; exact formula or standard by which such qualities may be measured has never been achieved; mechanical application of any standard is certainly not practicable. Much must be left here to the judgment of the examiners. The test cannot be wholly objective and to the extent that it is subjective the result may depend as much upon the fitness of the examiners as upon the fitness of the candidate. That is a risk inherent in all systems of examination."

And in conclusion, the Court of Appeals said: " Appeal may be addressed to the courts only where it is made to appear that examiners acted arbitrarily and without application of ' measures or standards which are sufficiently objective to be capable of being challenged and reviewed, when necessary, by other examiners of equal ability and experience.' (*Matter of Fink* v. *Finegan, supra,* p. 362.) "

The rationale of these decisions is that personality tests should employ objective standards so far as possible. The courts recognize, however, that especially in examinations which are to test broad cultural learning, wholly objective examinations are not always possible. In such cases it should appear that the tests are reasonably calculated to show merit and fitness and not merely to show the unfettered preferences or judgment of the examiners.

We may approach our inquiry as to whether these rules were followed in the present case by examining the results obtained. This leads us to inquire into what objective standards of the quality " judgment " could be applied to a candidate which would result in such a wide range of rating as thirty per cent by one examiner and seventy per cent by another? Is " clearness and quickness of comprehension " measured objectively when one examiner gives a candidate forty per cent and the same candidate is given seventy-five per cent by another examiner? Again, one examiner allowed a candidate fifty per cent for " manner," and the same candidate was allowed eighty per cent by another examiner.

As to " judgment," the candidates were rated in part on " soundness of position taken." For reasons which will be indicated hereafter, the rating could not have been based on soundness

of position taken, as measured by established principles, but, obviously, on the unfettered judgment of the examiner depending on agreement or disagreement with the latter's "viewpoint." "Clearness and quickness of comprehension" were defined as "clarity" and "time taken." The record fails to disclose standards of rating. As to "manner," the examiners were instructed to observe candidates as to whether they were overbearing, truculent, apologetic, etc. Of course, the record could not disclose these elements. It does disclose considerable difference of opinion among the examiners concerning their observations in these matters.

In an endeavor to understand the ratings allowed, we have read the stenographic transcript of the technical-oral examination and have compared the answers of the successful candidate with those of the unsuccessful candidates in response to the same or similar questions. Without attempting to judge the technical merit of the contents, we find that the answers of many of the unsuccessful candidates were more responsive and textually superior to those of the successful candidate.

On the oral examination several candidates were asked the question: "What do you consider to be the major defects in the American system of education?" The following are the answers of the successful candidate, Jablonower, and an unsuccessful candidate, Moskowitz, to that question:

### JABLONOWER

"Well, the first in training of teachers, so that in making the children as they do in thier own image you have the defects perpetuated. As a teacher I became aware of the extent to which I lacked the experience, direct contact, with some of the things about which I had occasion to speak. Now, as I've been among teachers even in the field of mathematics itself, the teachers are sometimes startled to find that it actually works, that is, it is a class-room exercise, most of the work that is done is a book one — a class-room exercise, that is, I regard it as perhaps, well, at least it

### MOSKOWITZ

"Our defects of course come from our virtues because we are a democracy, and that very virtue brings the defect and I indicate the word 'virtue'— which indicates that I do believe in democracy and believe the defect is worth having for the benefits which we receive. But I'd say the particular defect is its aimlessness, purposelessness, — we don't know where we are going. The great value and benefit of a totalitarian state is that it sets up an educational goal and achieves it. Say what you will about the goal, nevertheless, it does get what it goes after.

JABLONOWER

occurred to me first and I am not sure that it is the most important, but very important, yes. Second one is the pyramidal picture of the American educational scheme, that is,— Mr. Edgar (?) used that figure of speech a number of years ago, that you have at the top a superintendent or a supervisor and then the others take directions from him and although the authority may filter down he is essentially the center; and I think that tends even further to promote the failure of teachers to make contacts because it isn't their business to make them, it isn't their business to know more,— that is, while it isn't put in so many words, the conduct of the schools is of that character that the superintendent, the supervisor, is regarded as the responsible person, so that — it is given away very often naively when the principal will say ' my school ' or ' my teachers ' and the superintendent says that, and I don't think that he is arrogant,— I think it is the pattern of our scheme that has just impressed itself upon him and that is his response to it. The third, I think, would be remedied if the first two were. And, that is the very backward character of our syllabus that is backward because of the fact that the teachers are giving what they have in the nature of the case. With their own

MOSKOWITZ

Prussia, Germany, Italy, educationally are efficient. I say we may not accept their educational program, but at least they know where they are going — they know what they want — they have leadership. Now, our educational system has no leadership. We have no,— we have a National Department of Education, a bureau which of course is purely a statistical body, and I believe with our set-up should remain so. I personally would object, being somewhat of a Jeffersonian, I would object to seeing the Federal Bureau of Education become a guiding, powerful prescriptive body. But, however, despite this failure on our part to develop a national planning and guiding educational force, we do have set-ups in each state, but there too the state commissioners of education, the state superintendents of education do not have the power, they don't have the force, to put across any program of education which gets results. Within our City, the same thing is true. I know I, as a principal of a school, have no guidance, no leadership. If my school achieves anything, it achieves it because of the aims and purposes which I happen to have or don't have. If I die culturally and professionally, I still hold my job and everything goes on as before. There is, however, a possibly unifying force in

JABLONOWER

MOSKOWITZ

training being of that character they are content to go on with it. I think that the others that I might think of wouldn't be of the same dimension as those, so I prefer to leave it there."

He developed the subject further as follows:

" It would be in this connection then. The definition is, I should say the definition of success on the part of a teacher, it is not very different from the definition that we found in the community if a person says, ' Oh, he's still teaching!' that's, has in it an overtone of some condemnation of the fact that he was standing still, the fact that he is still teaching. There is a misprising of his own function and that in a way is perhaps an effect of the thing I spoke about a little while ago, that is, the superintendent is the responsible person and of course people to be significant want responsibility, therefore it is a badge of disability, not to be limited to the teaching function. As I said, I think that would be subjected, that would undergo correction if some of the other things of which I just spoke were carried forward because after all thought I must admit to myself I'd like to make the argument perfectly clear, but I don't think I can. Perhaps he means under a more liberal definition of the superintendent's and the teacher's functions it is not likely that for

America despite this general set-up which I have described, namely, that we do not have frontier thinkers in the field of education; we do have our Deweys, our Counts and our Logans; we do have one language; we do have national journals of education; we do have national associations; and these organizations, these persons, through their individual power, through the prestige of their ideas, do tend somewhat to integrate our purposes, but I said before we pay a very heavy price for our democracy in this country, in the aimlessness of our whole educational set-up. We don't know where we are going. Possibly in the field of elementary education,— I will have to subdivide the two fields, — we know where we are going with a little more certainty than in the field of secondary education. In the field of secondary education you can't even get a satisfactory definition of what a high school is, and what a high-school pupil is, or is not. In the field of elementary education, fortunately, there are certain adaptations which must be made,— a certain amount of reading, writing and arithmetic, must be taught,— a certain amount of common integrating knowledge must be given, despite the leaderlessness of this whole system, so the elementary school doesn't suffer quite to the same

JABLONOWER · MOSKOWITZ

a long time teachers will,— the average individual will,— be willing to carry on his day to day functions and say this is my job and it has its uses and that is what makes it important."

degree to which the secondary school suffers, but in the field of secondary education, especially in the field of vocational education, we are all moving in a morass, aimlessly, blindly, knowing not where we are going, and nobody seems to offer leadership. Certainly there is no leadership in New York City, and although in secondary education there may be our Briggs, and Judds and, shall I say, Tildesleys, certainly an accepted leader in the country, nevertheless their voices are not so clear, their programs not so distinct that they may be followed, so we just move along in secondary education, aimlessly, but that however, has, as I said at the very beginning, a virtue and that is the very virtue of democracy — that we fumble, that we muddle, but ultimately we do hope that some progress is made. That has been the genius of the British people, and yet they have made progress; they have built up a British Empire and we do hope we will not have to pay too high a price in this country for a lack of an integrated force in the whole educational program."

We think that a reading of the foregoing answers will demonstrate that at least in this instance "clarity" was not the controlling factor in the rating made by the examiners.

We have carefully considered all of the questions asked and the answers given under part II of the examination, in an endeavor to understand the extraordinary result arrived at by the examiners

who found fifteen out of sixteen candidates lacking in " personality," though they had all passed both the written and the technical parts of the examination.

The petition alleges that the public press reported that the respondent Kern, the president of the municipal civil service commission, explained the failure of the unsuccessful candidates as follows: " The reason 113 candidates failed to pass the last examination for Examiner of the Board of Education was that every one of these candidates had a woeful lack of social vision and the narrow viewpoint on the question of trade unionism."

The respondent Kern makes affidavit that the true version of his remarks is as follows:

" It is generally supposed that it has been settled that the schools belong to the democratic people of the State and that the main purpose of the school is the training of citizens for democracy.

" Resistance to the democratic theory of education has arisen only in the past few weeks. With the threats of repression, the main problem of trade unionism has now become the preservation of the democratic system under which demands that the millions of the children under our care be trained, taught and educated in the principles and practices of democracy, just as thoroughly and completely as the children in fascist countries are taught the doctrine of force.

" The Civil Service Commission sought to select the best talent to fill the vacancies on the Board of Examiners. The distinguished educators conducting this test — Dean Ned Dearborn of New York University, Dean Margaret Keily of Queens College, Dr. Jesse Newlon and Dr. Willard Elsbree of Columbia University, Teachers College, and Ordway Tead, scientific editor of Harper's Publishing Company — believed thoroughly in the democratic system of government. If these educators rejected persons because such persons believed in the suppression of free speech and civil liberties or because such persons believed in the violent repression of discordant intellectual or social views, they should be backed against all outside criticism."

Parenthetically, it is significant to find the successful candidate advocating contact with trade unions by prospective teachers.

After consideration of the stenographic transcript and phonographic recordings of part II of the examination, we fail to find any support for the explanation offered by the respondent Kern for the failure of all but one of the candidates. We do, however, find much support for the charges of the petitioners that the examination entered into improper fields and that there was a

studied effort to find a candidate with a particular point of view on certain political, social and economic questions. We deem the matter of sufficient importance to the civil service and to public education to warrant our setting forth at length a number of instances in which, in our opinion, the examination departed from the proper sphere of a " personality " test.

Instructions issued to the examiners, governing the conduct of part II of the technical-oral examination, contain the following:

" Supplementary Statement for Panel of Examiners.

" Among the areas from which questions may be constructed when necessary are:

" (1) The relation of the Board of Examiners to the improvement of education in New York City.

" (2) The needs of education in New York City.

" (3) The kinds of qualifications that teachers and other educational workers should have.

" (4) Some of the important educational and social problems in the U. S.

" (5) The interrelationships of local and national social and educational problems.

" (6) The interrelationships of social and educational problems.

" (7) The relation of an examining philosophy to a *social* philosophy.

" (8) The relation of administration to good teaching.

" (9) The relation of the teacher to educational administration and the development of an educational program.

" (10) Evaluation of the elementary or secondary schools or colleges."

Though none of these areas necessarily included fields of political ideology, a number of the questions submitted to candidates on the oral test clearly were intended to reflect such ideologies.

Section 25 of the Civil Service Law prohibits the asking of any questions relating to the political opinion of any candidate. It provides that no appointment under civil service shall be *in any manner* affected or influenced by such opinions.

We do not understand the mandate regarding " political opinions," as used in this statute, to forbid merely inquiry concerning whether a civil service candidate is a member of an existing political party, or usually makes a choice between such parties in voting. It should be given a broader meaning, especially when today political thought is dividing along other than ordinary party lines. The constitutional requirement that appointments in the civil service

be based on merit and fitness (Art. V, § 6) and the prohibition of section 25, read in the light of that constitutional requirement, prohibits searching the political opinions of all candidates in any manner. Candidates are placed on an equal footing, irrespective of whether they may be classed as tories, conservatives, laborites, liberals, or even so-called "radicals," so long as they believe in and support our constitutional government and are willing to uphold our Constitution. We accordingly hold that questions directed to searching the political ideologies of a candidate, for the purpose of rating him or her higher or lower because of holding one political view rather than another, are violative of our Constitution and our Civil Service Law.

The court is cognizant of the fact that the subject-matter of education is closely related to the organization of society and the intellectual needs of the time. While this relation might justify the examiners searching into the social views of candidates to a reasonable extent, it would not justify rating them as to the "soundness of position taken" by securing their views on political or even closely related and highly controversial social and economic subjects.

Questions addressed to the political or quasi-political views of the candidates would seem especially unnecessary on the oral examination in this case in view of the fact that eight of the fifteen hours of the written examination were devoted to the subject of educational sociology.

The written examination was divided into four parts. The third and fourth parts thereof each contained forty topics for discussion. A large number of these eighty questions were based on hypotheses involving social and economic problems. One cannot read these questions without getting the impression that the composers of the written examination went as far as could be justified in securing the viewpoints of the candidates on such issues. Under the circumstances the oral test as to "personality" might well have omitted any further reference to topics of this nature.

We appreciate that it was for the examiners and not for the courts to choose between the candidates as to "judgment" and the other standards considered on the oral examination. But the choice must be made upon a competitive basis which requires that the examiners employ a standard or measure sufficiently objective to be reviewed by other examiners. "Judgment" here was to be measured among other criteria by the "soundness of the position taken." In so far as we can glean from the transcript of the examination, the "position" taken by the successful

candidate, Jablonower, consisted largely of the assertion of ultra "liberal" views, including a firm stand against "authoritarianism" in education. In effect, he stated that as an examiner he would not approve of the appointment of a public school principal who has authoritarian views.

We cannot believe that Jablonower was using the word "authoritarian" in the sense that, as an examiner, he would refuse to appoint a teacher or a principal who would recognize lawful authority.

We take it from the context of Jablonower's answers that what he intended to refer to as an "authoritarian" was an educator who believed in compelling strict "followship" along a fixed course of study. The opposing ideology seems to be that in a truly "democratic" education direction and control should come "from below" rather than "from above." The authoritarian finds some things of sufficiently fixed value in what has come down from the past to warrant his teaching them authoritatively. Those opposing authoritarianism object to any such teaching; they reject all tradition and believe in unrestrained freedom of thought among students. It is plain from a mere statement of Jablonower's ideologies that they are controversial in nature. In expounding his ideology, Jablonower stated that unless he could convince a candidate coming before him for appointment as a public school principal of the error of "authoritarian" views, he would refuse to appoint such a person as a principal. Considered solely as an abstract theory of education, Jablonower's suggestion is most extreme. Considered from the concrete viewpoint of what Jablonower would do as an examiner in the board of education, the "position taken" by him is even more startling. It propounds the strangely intolerant doctrine — coming from a professed "liberal" — that one who disagrees with the personal ideologies of the examiner on a highly controversial issue should not receive an appointment to the teaching staff. We do not merely point out the intolerant nature of this suggestion. Fortunately, our Civil Service Law does not need to plead for tolerance; it commands equality. Of course, it would be improper for an examiner to bar any one from the teaching staff merely because of a disagreement of the candidate with the examiner's peculiar ideologies. We do not mean to indicate that because Jablonower took such an extreme position on this one subject in an extensive examination covering many other topics that we deem him disqualified. We have no intention to attempt to pass on his qualifications. That is not our function. But it is our function to see that a "personality" test is kept as an aid to the

ascertainment of merit and fitness. We are not greatly concerned that an enthusiastic candidate, who perhaps was trying to impress his questioners with the " advanced " nature of his ideas, should expound an erroneous theory as to the power or duties of an examiner. We are concerned with the " objectivity " of a " personality " test that determines the merit and fitness of candidates by the " soundness of the position taken," and then entertains discussion along the lines indicated. We are also concerned that the matters discussed involve the " position taken " rather than the knowledge possessed concerning highly controversial issues in education. If the State of New York (through its Department of Education) wishes to experiment with classes or schools in which there is less exercise of authority on the part of teacher or principal, or otherwise investigate the allegedly progressive ideas of some educators, it is entirely within its province to do so. But it is not the function of the civil service commission or one of its panel of examiners to decide questions concerning policies of education. That being so, we fail to see how the " soundness " of the views of candidates for the high position of examiner in the board of education could be determined concerning such controversial subjects without having the examining panel make the decision on such matters. There is no objective standard of measure in such a method of examination, but a mere reliance on the judgment of the examiner. Were the successful candidate permitted to bring to the discharge of the duties of the position the methods applied by the examiners here, ultimately the teaching staff of our schools would reflect the personal ideologies of the examiners. It was never intended that the civil service commission, or any examining panel, by an examination of this character, should exercise such control over the aims, purposes, theories and direction of education. When a candidate is to be rated on the soundness of position taken, the examiner should avoid controversial subjects on which divergent views might well be held by those who had control of educational policies. Otherwise, the success or failure of a candidate, as well as the determination of educational policies, would depend upon the agreement or disagreement with the views of the civil service commission or the examining panel, which, in turn, might be in entire disagreement with the views of the duly constituted authorities controlling education. When oral tests are resorted to of the nature here used, as was said in *Matter of Fink* v. *Finegan (supra)*, " even the most scrupulous examiner may be influenced in his determination by unconscious prejudice and bias."

The members of the examining panel, in the affidavits submitted in opposition to this motion, stated that the panel did not encourage discussion in the field which we criticize, but that candidates frequently entered the field themselves. The stenographic record of part II of the oral examination does not bear out this contention. For example, in the successful candidate's examination under part II, after giving his views as to the major defects of the American system of education, he was asked to elaborate those views " *with* reference to the structure of American society." When he did not respond directly he was quite pointedly told by an examiner to expound the views he had expressed against the centering of authority in the school system with relation to American society generally. The candidate then proceeded to discuss the possibility of putting the views he had expressed against " authoritarianism " in effect in industry generally. He also discussed what he, as a member of the board of examiners, would do in order to avoid appointing an authoritarian a school principal' whereupon one of the examiners broke in with the question: " Could you do that if you were in Germany? "

Candidate Bridgman, a World war veteran, was asked to indicate criteria with which he would evaluate American education today. He included in his answer the test as to whether such education had a democratizing influence. He then proceeded to discuss various other criteria at length, and was later asked as to what extent he thought the criteria mentioned prevailed in New York city's school system today. His answer was that, unfortunately, there were some among the teaching staff who seemed to be desirous of tearing down the American ideals and mentioned a group which he labeled as " Communistic." He was then asked to be specific as to what ideals he believed were endangered by the group. His response, in effect, was that he thought this was a pretty difficult subject to talk about. However, he was encouraged by the examiner to do so. He then answered as follows: " We know that these subversive forces are working; we know that they are working against government; we know that they are working against authority,— those ideals which we consider necessary in the democratic process today,— how to stop them seems to be an almost impossible task, how to controvert their objectives seems to be almost impossible, but they work in and under and continue to do and that is a particular force I had in mind when I spoke. I hope I tread nobody's toes, but I am very frank about it."

Then followed a question as to what an examiner in the board of education might do to solve this problem. The gist of the

candidate's answer was that he recognized the right of all prospective teachers to their political beliefs; that he would not by any means favor a " Red " hunt, but that he thought that the examiner should do everything possible to see that the candidates were acceptable from prevailing standards, to see that those who were of the forces which undermine our principles of government should not be permitted to teach.

After the examination had been diverted to other topics, the candidate was then asked directly by an examiner as to whether he would deem membership in one of the teachers' unions as affecting acceptability. His answer was that he thought it should do so only if the person being examined had been extremely active in subversive movements. Later he developed the view as follows: " I said if the person is found being subversive in his tactics and political views undermining the principles of the country, a person may be a Communist and not undermine the principles of this country; he may believe in Communism as a theory or even as a practice, it doesn't necessarily mean that he is destructive in tendency. Now if a person was destructive, be he Democrat or Communist or Republican, I wouldn't have the slightest hesitancy in assailing him; if I could; legally I don't know whether that would hold water or not."

After the examination had again progressed considerably in other matters, the following colloquy took place:

" To satisfy myself going back some distance, you mentioned ' Communist threat,' to democratic principles. In that connection you said I think that it was the duty of the Board of Education to the Board of Examiners to accept, to pass acceptable candidates? A. Yes. Q. In the light of your feeling on that ' threat ' would you cite a specific instance of an unacceptable teacher? A. I think I have already cited that. Q. Other than the ones on record? A. You mean aside from Communistic tendencies or one with that type of tendency, rather? Q. If that constitutes an unacceptable candidate do you feel free to answer your meaning of the unacceptable candidate; I am interested in a possible type? "

The answer was not directly responsive, and the examiner then asked the candidate to elaborate on his views as to who would be an " undesirable " candidate for teacher. His answer was: " I know, that is what I have been trying to dodge, that word ' undesirable.' I simply can't get away from it. I don't think a person undesirable who merely belongs to a certain party; I mean that in itself does not constitute undesirability, but if a person belongs to any party or no party at all engages in acts which are detrimental

to the best interests and welfare of the community at large or school in particular, then I would personally think she is undesirable again depending on the individual case and exactly what that person did. If she was the type of person who in my opinion would evolve into a sore spot in the system forever after, I think it would be much better for everybody concerned if that person were eliminated before any license were granted; I mean, have I answered your question? "

Candidate Kroll was asked to dwell on the question as to whether a member of the board of examiners should be completely unbiased with respect to all education and social problems. After an attempt to show that complete lack of bias was practically impossible, and that bias in certain directions was not always undesirable, he proceeded to expound the theory that in a democracy we should indoctrinate basically for democracy; that an examiner could not permit acceptance of a teacher who would indoctrinate for any other political order in this country. After this subject had been discussed at length, the candidate was asked the question as to how he could reconcile the phrase he had used of " helping people to become loyal to the State " with his later discussion of " Freedom".

Kroll, near the end of his examination, was brought back to the subject of " bias " and asked to discuss the question as to whether the board of examiners should seek teachers who have an approved bias regarding controversial social problems, but who seek to be objective in their points of view and teaching.

Candidate Ward was asked to discuss vocational schools. She was then asked to discuss the question as to what she thought the attitude of organized labor should be as to free vocational education. When she responded that the attitude should be co-operative, the question was then interjected as what she thought the vocational schools should do as to giving the lead or cue to students therein as to the wisdom of their becoming members of a trade union when they finished school.

Moskowitz, after discussing his ideology as to the proper relationship between principal and teacher, was asked the following question: " Is there any place in the democratic society for authority? " He answered " yes " and proceeded to demonstrate that as to administration, when acting as a school principal, he would expect teachers under him to obey instructions. Then he was asked the question as to whether he, as principal, would think it proper if he found a teacher deviating from the course of study to require the teacher to follow the course.

We cite the foregoing to illustrate the extent to which political ideologies of the candidates, or their ideologies on kindred subjects

were searched. The citations will also serve to demonstrate that it was not always the answer of the candidate which caused the invasion into such fields of discussion, but frequently it was the questions asked by examiners that brought this about. At least, the examining panel did not try to avoid entering these fields. When the determination of fitness is based on the soundness of view, we reiterate that such controversial subjects should be avoided, otherwise a " personality " test becomes entirely subjective.

Summing up these " personality " tests, the result has been that a candidate who held views opposed to the appointment of teachers actively participating in subversive activities, received a failing mark on personality, and the candidate who was opposed to appointment of an " authoritarian " as a school principal received a passing mark. We do not wish to indicate what the proper result should be, but rather the error of permitting such matters to be made part of such a test as this. It is not our purpose to show that the answers given were incorrectly rated, but that the questions asked were improper and made the examination one lacking in objectivity.

The petitioners complain further that a majority of the examining panel conducting part II of the technical-oral examination was connected with the so-called " left wing," or extremely liberal group of educators. They cite in support of this that the chairman of the panel was editor of an educational magazine known as " The Social Frontier," and that two other members of the panel had subscribed articles to this magazine. Copies of the magazine have been submitted for our perusal.

We are not interested in the ideologies of the examining panel, either political or along educational lines. Progress in education may well justify experiments of a nature that might be contrary to some customary views on the subject. At least an open forum for discussion on such matters in the nature of a narrative should not be objected to. But such discussions should be confined to their proper sphere. A personality test is no place for them. However, we might add that a panel of examiners whose expressed views are sympathetic to a " type " desired could be selected readily if subjective methods were to control in an examination of the character here involved.

Personality tests in a civil service examination not only should not enter the field of political ideologies, but should not be so ordered or conducted that the examining panel giving the oral examination is purposely controlled by persons having " liberal " or " conservative " views on such matter as proposed educational changes which are highly controversial, in order to assure selection

of a " liberal " or a " conservative " holding like views. If such objects control the selection of the panel, the examination ceases to become a trial of merit and fitness.

The value of " personality " tests is a matter upon which divergent views have been formed, particularly when the tests are applied to adult persons. To some extent such " personality " tests are in use in the commercial world by corporations which employ a great many workers. Civil service examining bodies are free to use them so long as methods may be adapted to the civil service without violation of the letter or spirit of the law. We consider them in violation of the law when they search the candidate's political views, no matter what guise is adopted in making such inquiries, and equally offensive if they are framed so as to assure an appointee of a particular school of thought favored by the examining commission or its panel.

The respondent Kern, in his public utterances, as quoted in the record, said, in effect, that a " liberal " educator was sought as an examiner. The record herein supports that statement. We think that such a purpose violated the Civil Service Law. For the reasons indicated, we find part II of the technical-oral examination was illegal.

The order appealed from should be modified and the petition of the petitioners granted to the extent of directing the cancellation of the appointment of the respondent Jablonower; and the respondent municipal civil service commission is directed to conduct a technical-oral test in accordance with law, which test shall be open to all candidates who successfully passed the written examinations.

MARTIN, P. J., O'MALLEY and TOWNLEY, JJ., concur.

MARTIN, P. J. (concurring). The record discloses a predetermined effort to select one and only one man for the position of examiner. We find that twenty-seven applicants, all of whom passed the written examination with a higher mark than the respondent Jablonower, were failed in the oral test, although it was conceded on the argument that many of such applicants had years of experience and were exceptionally able. The oral examination of some of the petitioners herein, judged objectively, was far superior to that of Jablonower. Despite that fact they were all failed.

It is argued by the petitioners that:

" There is no question but that petitioners, had they been given a percentage rating, would have received a much higher rating than a mere passing mark, and a higher rating than respondent Joseph Jablonower, since he had less experience in the public

school system and in assisting the Board of Examiners than any of the petitioners.

"Petitioners thus far surpassed respondent Jablonower in both the written test and in experience, which parts of the examination had a weight of 8 out of a total of 10 points."

The record appears to sustain the contention of the petitioners.

Phonographic recordings of part II of the oral examinations were made. The representative of the respondent municipal civil service commission stated to the court at Special Term that the records were not clear by reason of "operational difficulties." Despite that statement and a statement to the same effect in the brief submitted on behalf of the municipal civil service commission, the members of this court insisted on hearing the records and went to Radio Station W.N.Y.C. for that purpose. The members of this court found no such operational difficulties and had no difficulty in understanding the records and were impressed by the comparative incompetence of the respondent Jablonower, as reflected by this oral demonstration.

COHN, J. (concurring). I am of the opinion that the municipal civil service commission violated the statute in limiting the eligible list for the position of examiner to a single name where there were other qualified candidates. The statement of the president of the municipal civil service commission to the effect that individuals who came to the final orals were not unqualified and that the examiners did not appraise them on a relative basis but were to select the top one or two of the eligibles, is evidence that the eligible list was intentionally restricted to one man.

In part, this plan was executed by written instructions to the panel of examiners conducting the oral examinations to "fail not less than about one-half the total group of candidates" who had passed the written examination, and by another order which directed that ratings of "60% and 75%" be allotted to candidates whose technical competence is only very slightly below that of a high grade examiner. As the final passing mark for all three parts of the examination was fixed at seventy-five per cent, the direction to the examiners to rate between sixty per cent and seventy-five per cent candidates only very slightly below that of a high grade examiner undoubtedly might have excluded some whose technical competence was in every way satisfactory.

It may well be that the president of the municipal civil service commission in good faith believed that it was in the public interest to confine the eligible list to a single name though several may have been qualified. However, such a limitation is violative of the

provisions of the statute. Section 871 of the Education Law provides that those who qualify in the examination for the position of examiner, board of education, are to be placed upon an eligible list from which appointments may be made for a period of four years from the date of its promulgation. Candidates who are in every respect qualified may not be barred and thus deprived of opportunities of appointment during the four years the list is to remain in force.

Moreover, the plan removes from the appointing agency, that is, the board of education, the power of selection of one of three persons who are willing to accept, and are graded highest on the eligible list. (Rules for the Classified Civil Service, rule VIII, subds. 1 and 2; *People ex rel. Balcom* v. *Mosher*, 163 N. Y. 32.) Under the law, it is the function of the municipal civil service commission to prepare an eligible list of all those found to be qualified upon appropriate, open competitive examinations. Once that list is established, the commission's remaining duty consists in certifying the three highest names on the list when a vacancy occurs. The power of appointment and selection from amongst those certified is vested by law exclusively in the department or agency in which the vacancy exists — in this case, the board of education of the city of New York. An eligible list intentionally limited to one name would operate as a transfer of the power of appointment from the board of education to the municipal civil service commission.

As to the merits of the respective candidates, it has long been the rule that " *the court can neither conduct nor supervise civil service examinations* " (*People ex rel. Caridi* v. *Creelman*, 150 App. Div. 746, 749) and the acts of the civil service commissioners may only be questioned in court when some provision of the Constitution or of a statute which vests no discretion in the commissioners has been violated. (*People ex rel. Braisted* v. *McCooey*, 100 App. Div. 240; *Matter of Sheridan* v. *Kern*, 255 id. 57, 59.) The standards used in rating the competitors must be objective, and reviewable by other examiners of equal ability and experience. If the examination is fairly conducted and in accordance with law, there may be no judicial interference. Only when the discretion of the commissioners is illegally and unreasonably exercised, may a person aggrieved appeal for redress to the courts. (*Matter of Sloat* v. *Board of Examiners*, 274 N. Y. 367; *Matter of Fink* v. *Finegan*, 270 id. 356.)

The technical-oral examination was carefully prepared. Part I comprised a test which consisted of having candidates witness

a demonstration examination in which an employee of the commission took the role of a candidate for a license in the school system and another employee acted as an examiner. The candidate was required to rate the demonstration examiner and demonstration subject upon the quality of their performance and then to support the ratings given. Part II of the technical-oral examination consisted of two subdivisions. The first was intended to enable examiners to observe the candidates in the performance of the actual work of an examiner. The second portion of part II consisted of direct questioning of the candidates upon important educational problems. Generally, each part of the technical-oral examination was designed to rate the candidates upon the following five qualities: (1) Judgment; (2) clearness and quickness of comprehension; (3) appearance; (4) manner; (5) speech. Tests such as these devised to measure the factors enumerated in a candidate for the position of examiner for the board of education of the city of New York would be objective, and of practical value in determining merit and fitness. These examinations were reviewable to the extent that all the questions and answers were recorded.

I agree with the view expressed in the opinion of Mr. Justice CALLAHAN that there should be no inquiries made by the examiners into the political and quasi-political ideologies of the candidates. If such a practice were indulged in, it would clearly violate the statute. (Civil Service Law, § 25; Rules for the Classified Civil Service, rule II, subds. 3, 4 and 5.) Such discussion should be shunned, even if initiated and developed out of the answers given by the candidates themselves. It is to be noted that each of the five members of the examining panel in charge of part II of the technical-oral examination has affirmed under oath that it was not the purpose of the examination to ascertain the political, social or economic views of any candidate and that any such views, if expressed, were not discussed or considered by the members of the panel among themselves or with any member or representative of the municipal civil service commission; that all questions were prepared solely to determine fitness for the position and "were calculated to have a practical bearing upon the candidate's professional competence to discharge the duties of an Examiner."

Many of the allegations contained in the petition of appellants are unsupported by facts. To discuss them all would serve no useful purpose. Joseph Jablonower, the respondent, who was the only successful candidate, taught in the New York city schools until 1919. When he resigned from his position as a high school teacher in that year, he received the highest ratings. Since that

time and until his appointment as examiner, he has been continuously connected with the staff of an established private school as a teacher and in a supervisory capacity. Under the law, the court may not substitute its judgment as to the qualifications of the respective candidates for that of the examiners of the civil service commission. Upon a scrutiny of the record I cannot say that their judgment in finding respondent Jablonower fully qualified was not correct. However, the error committed by the municipal civil service commission in illegally limiting the eligible list to one name operated to the obvious prejudice of other well-qualified candidates who were thus deprived of a place thereon and of the right to be certified for appointment for existing and future vacancies.

For the foregoing reasons I concur in the opinion of Mr. Justice CALLAHAN to the extent of reversing the order and directing the municipal civil service commission to re-examine orally for technical competence and personality the petitioners and all others who passed the written examinations, as well as Jablonower, and thereafter to promulgate an eligible list containing the names of all qualified candidates in their regular order.

Order unanimously modified and the petition of the petitioners granted to the extent of directing the cancellation of the appointment of the respondent Jablonower; and the respondent municipal civil service commission is directed to conduct a technical-oral test in accordance with law, which test shall be open to all candidates who successfully passed the written examinations. Settle order on notice.