[L. A. No. 20478. In Bank. Oct. 25, 1949.]

ALFRED G. ALMASSY, Appellant, v. LOS ANGELES COUNTY CIVIL SERVICE COMMISSION et al., Respondents.

Harmel L. Pratt for Appellant.

Culbert L. Olson and John W. Olson as Amici Curiae on behalf of Appellant.

Harold W. Kennedy, County Counsel, Charles C. Stanley, Jr., and Andrew O. Porter, Deputy County Counsel, for Respondents.

Fred N. Howser, Attorney General, Wilmer W. Morse, Deputy Attorney General, Ray L. Chesebro, City Attorney,

Bourke Jones, Assistant City Attorney, George William Adams, Alan G. Campbell, Deputy City Attorneys, Albert E. Weller, County Counsel (San Bernardino), and B. L. Lunceford, Deputy County Counsel, as Amici Curiae on behalf of Respondents.

SPENCE, J.—Petitioner appeals from a judgment denying his application for a writ of mandate to compel the Los Angeles County Civil Service Commission to annul two promotional civil service examinations and the corresponding eligible lists promulgated upon the results thereof. The problem presented is the validity of certain evaluation procedure, in addition to written tests, adopted by the commission as part of the process of rating candidates for the positions to be filled—an allegedly common practice in the conduct of civil service examinations throughout the state. While it appears that the eligible lists here attacked have already expired by reason of the lapse of the prescribed two-year limit (charter, art. IX, § 34(4); commission rule XI, § 3), the evaluation procedure challenged in the present case is in current use. Its validity is a matter of importance to the commission and would probably be relitigated until a final decision was given by this court. The questions involved in the present case are continuing and "their consideration ought not to be . . . defeated, by short term orders, capable of repetition, yet evading review . . ." (*Southern Pacific Terminal Co.* v. *Interstate Commerce Com.*, 219 U.S. 498, 515 [31 S.Ct. 279, 55 L.Ed. 310]; also, *Federal Trade Com.* v. *Goodyear Tire & Rubber Co.*, 304 U.S. 257 [58 S.Ct. 863, 82 L.Ed. 1326]; *Ford Motor Co.* v. *United States*, 335 U.S. 313 [69 S.Ct. 93, 93 L.Ed. ——].) A decision on the merits is therefore proper.

There is no dispute as to the facts, pursuant to the parties' submission of the cause upon stipulation. In August, 1946, petitioner, an employee of the Probation Department of Los Angeles County, participated as a candidate in two promotional examinations for the respective positions of senior deputy probation officer, adult division and juvenile division. He failed to pass either examination, and his name did not appear on the eligible lists as subsequently promulgated by the commission on September 20, 1946. Within the time and in the manner provided by the rules of the commission, he duly prosecuted an appeal to that body, in which he protested the validity of the examinations and the method of their conduct.

By decision of December 24, 1946, the commission raised petitioner's final evaluation grade by a slight percentage in each instance but not enough to qualify him with a passing average upon either examination, and denied the appeal in all other respects. Petitioner then brought the present proceeding.

Both in the trial court and upon this appeal, petitioner has maintained that the two promotional examinations in question and the corresponding eligible lists were illegal and void for failure to comply with the controlling provisions of the Los Angeles County Charter and the rules of the civil service commission established pursuant thereto. However, careful analysis of the challenged procedure reveals it to be within the bounds of determination by the commission consistent with the broad powers conferred upon that administrative body to act in the premises.

The charter requires the commission to "prescribe . . . rules for the classified service, which shall have the force and effect of law" (art. IX, § 34) and which "shall provide . . . for open, competitive examinations to test the relative fitness of applicants for such positions" (art. IX, § 34(2)). It also requires that the said rules "provide . . . for promotion based on competitive examination and records of efficiency, character, conduct and seniority. Lists shall be created and promotion made therefrom in the same manner as prescribed for original appointment." (Art. IX, § 34(11).) The charter further states: "All examinations shall be impartial and shall deal with the duties and requirements of the position to be filled. When oral tests are used, a record of the examination, showing basis of rating, shall be made. . . . The Commission may call on other persons to draw up, conduct or mark examinations." (Art. IX, § 36.) These last quoted provisions are incorporated verbatim in rule VII, sections 3 and 10, respectively, of the rules established by the commission, while rule VIII, section 1, repeats the above quoted provisions of charter section 34(11), with the addition of the following: "The rules governing promotional examinations shall be the same as those governing original entrance examinations except as herein provided." Sections 4 and 5 of rule VIII then provide that in "all promotional examinations each employee shall be given, in addition to all other credits, a credit for efficiency" and "a credit for seniority," each not to exceed "five per cent of the total credits specified for [the] examination" and as "calculated from the Commission's record" thereof.

The ''Commission shall prepare, or have prepared under its direction, all examinations'' (rule VII, § 2), which ''shall embrace . . . subjects to which weights shall be assigned, the weight given to each subject to represent its relative value in ascertaining the fitness of the applicant. Each subject of examination shall be graded independently; this grade shall be multiplied by the weight assigned to such subject; the sum of the resulting products shall be divided by the total weight of all subjects in the examination, and the resulting quotient shall be the general average which shall be used in determining the order in which the name of the applicant shall appear on the eligible list . . . Unless otherwise provided in notices posted prior to holding the examination, the average percentage for proficiency required for passing shall be seventy per cent.'' (Rule VII, § 9.) The ''examination papers written by an applicant shall be open to his inspection . . . [but] the references and oral rating sheets shall be deemed confidential and shall not be open to [his] inspection.'' (Rule VII, § 13.) Provision is made for the taking of a written appeal to the commission for ''a change in rating in any part of the examination,'' and ''after consideration of the entire matter the Commission shall make its decision and determine the final rating of the candidate, which determination shall be final for all purposes.'' (Rule VII, § 15.)

The same procedure prevailed with respect to both of the promotional examinations here in question. As stated in the bulletin announcements, they consisted of two phases: (1) a written test and (2) ''an evaluation of the education, experience and personal fitness of each of the applicants, as verified by interview, investigation or references.'' Each of the two parts was assigned a relative weight of 50 per cent of the total grade. It is not contended here that the examinations were in any way defective or illegal insofar as the written parts are concerned, but objection is made solely to the equally weighted ''evaluation'' portions as determined by the commission to embrace factors properly subject of consideration in the fixing of the final grading.

The evaluation phase of the two examinations was conducted in the following manner. The candidate was required to fill out an application form, calling for a variety of personal data as well as detailed information concerning the individual's education and experience. He was then interviewed by two experienced examiners, well acquainted with the subjects of examination and the qualifications determined by the com-

mission to be necessary and important in the position to be filled. Each of the examiners rated the candidate on the basis of information contained in his application form, and educed or observed at the interview, as to his education, experience and personal fitness. These ratings were effected by making entries upon "General Qualifications Appraisal Record" forms furnished by the commission. These forms were subdivided into three sections, the first two of which contained blank spaces for entries adapted for rating the candidate upon "Education" and "Experience," respectively. The third section, to which petitioner's objection is chiefly directed, was entitled "Personal Fitness" and was in the following form:

PERSONAL FITNESS:

| PHYSICAL CHARACTERISTICS | | Poor | Weak | Acceptable | Good | Superior |
|---|---|---|---|---|---|---|
| a. Appearance | a. | ___ | ___ | ___ | ___ | ___ |
| b. Voice and Speech | b. | ___ | ___ | ___ | ___ | ___ |
| INTELLECTUAL FACTORS | | | | | | |
| c. Alertness | c. | ___ | ___ | ___ | ___ | ___ |
| d. Judgment (Depth and maturity of thinking.) | d. | ___ | ___ | ___ | ___ | ___ |
| e. Ability to express ideas | e. | ___ | ___ | ___ | ___ | ___ |
| EMOTIONAL FACTORS | | | | | | |
| f. Poise (Emotional adjustment, stability.) | f. | ___ | ___ | ___ | ___ | ___ |
| g. Social adaptability (Ability to meet people, make social adjustment.) | g. | ___ | ___ | ___ | ___ | ___ |
| PROFESSIONAL DEVELOPMENT | | | | | | |
| h. Orientation in the field (Knowledge of new trends, current problems.) | h. | ___ | ___ | ___ | ___ | ___ |
| i. Interest in job. | i. | ___ | ___ | ___ | ___ | ___ |
| FINAL EVALUATION: | | Poor | Weak | Acceptable | Good | Outstanding |

The entries made by each examiner upon such form were subsequently translated by the commission, in accordance with a fixed formula, to a numerical value on the basis of a maximum 100 points possible, and the ratings given by each examiner were then averaged together.

A further consideration in the evaluation phase consisted of a "Confidential Report" which was obtained for each candidate from his department head upon a form furnished by the commission for the purpose. Such form contained blank spaces in which checkmarks were to be entered, indicating the department head's appraisal of the candidate as either "poor,"

"fair," "average," "very good" or "outstanding," in respect to each of these qualities:

PERSONALITY FACTORS:
>Soundness of judgment
>Emotional maturity
>Dependability under stress
>Adaptability to new situations

SUPERVISION
>Ability to
>>Instruct employees
>>Establish effective work relationships
>>Assume responsibility for work performance
>>Improve methods of work
>>Maintain relationships with other agencies

PROFESSIONAL ATTITUDE:
>Participation in
>>Professional activities
>>Community activities

SPECIAL QUALIFICATIONS:
>Understanding of and interest in
>*probation case work* with adults
>Ability to
>*supervise adult case* workers

The department head was also requested to indicate by means of a checkmark his "overall evaluation" as to whether the candidate would probably "be inadequate to meet the demands of this position; give a weak performance in this position; meet satisfactorily the requirements of this position; make a contribution which exceeds average requirements; [or] provide an outstanding performance in this position." Several blank lines were left for the "remarks" of the department head at the end of the "overall evaluation." The form was prefaced by the following instructions: " (Indicate, by checking in the appropriate spaces, your judgment of the candidate with reference to the following factors. If your appraisal of the candidate can be strengthened by consulting others who know him, please consult with such persons. Since, for this type of position, so much reliance is placed on information gained in this manner, your careful evaluation of the candidate's qualifications and your frank comments are urged.) " The entries made by the department head were likewise translated to a numerical value on the basis of a maximum 100 points possible.

A total evaluation grade was obtained by combining the rating from the department head's report with the average of the two examiners' ratings in such a way as to give the former a 25 per cent weight and the latter a 75 per cent weight. The final grade upon the entire examination was then computed by averaging the total evaluation figure with the written test mark, giving a 50 per cent weight to each, and adding to the result the candidate's efficiency and seniority credits as provided in the rules. In the adult division examination, petitioner received a mark of 45.19 per cent on the written test, 54 per cent on the evaluation phase, plus total efficiency and seniority credits of 8.55 per cent, so that his final grade was 58.14 per cent. In the juvenile division examination, he received 50.81 per cent on the written test, 54 per cent on the evaluation phase, plus 8.55 per cent for efficiency and seniority, making a final grade of 60.95 per cent. As the result of his appeal to the commission, petitioner's final grades were increased to 61.64 per cent and 64.45 per cent respectively. A final grade of 70 per cent was necessary for passing.

Upon the basis of the foregoing facts, which were incorporated in its findings, the trial court concluded that "an evaluation of education, experience and personal fitness [was] a proper . . . part of . . . the . . . examinations," but that "in making such an evaluation . . . it [was] not proper under [the] Charter and rules to use a confidential report from the department head containing an appraisal of such qualities as the Civil Service Commission had determined to be necessary and important to personal fitness for the promotional positions to be filled." It was finally concluded, however, that "otherwise, the said examinations and each of them, were lawfully, fairly and properly conducted and the lists promulgated from the said examinations are valid and subsisting, were properly promulgated and should not be cancelled or annulled." Judgment thereupon was entered denying petitioner's application for a writ of mandate.

Consideration of the challenged procedure affecting the evaluation phase of the examinations in its bearing upon the ascertainment of the merit and fitness of the candidate for promotion sustains both parts thereof—the oral interviews by the examiners and the department head's confidential report—as within the scope of authorized decision on the part of the commission. Accordingly, in recognition of the validity of the dual aspect of the evaluation process as determined to be

"necessary and important" in the overall grading of the promotional examinations in question, it is proper that the judgment be affirmed.

The first argument to be considered is the claim that neither the charter nor the commission's rules permit an evaluation of education, experience and personal fitness as part of the examinations. There is no merit to such position. It is manifest from the provisions of the charter and rules above quoted that subject to the limitation that "all examinations shall be impartial and shall deal with the duties and requirements of the position to be filled" (art. IX, § 36; rule VII, § 3), the civil service commission has been given broad discretionary powers in determining the subjects of examination and the qualifications which are to be measured. (See Field, Civil Service Law, 1939, p. 86, pp. 132-133; *Keller* v. *Hewitt*, 109 Cal. 146, 147 [41 P. 871]; *Maxwell* v. *Civil Service Com.*, 169 Cal. 336, 338-339 [146 P. 869]; *Haub* v. *Tuttle*, 80 Cal.App. 561, 569-570 [251 P. 925]; *Mitchell* v. *McKevitt*, 128 Cal.App. 458, 465 [17 P.2d 789].) Judicial interference under such circumstances is unjustified except on a showing of arbitrary, fraudulent, or capricious conduct, or a clear abuse of discretion. (*Pratt* v. *Rosenthal*, 181 Cal. 158, 163-164 [183 P. 542]; *Nelson* v. *Dean*, 27 Cal.2d 873, 881 [168 P.2d 16, 168 A.L.R. 467]; *Dierssen* v. *Civil Service Com.*, 43 Cal.App.2d 53, 63 [110 P.2d 513].) No such showing was made in this case; rather, on the contrary, the qualities of personal fitness, and the various aspects thereof, which were to be rated on the examinations in question, appear to have a reasonable bearing upon the "duties and requirements" of the position of senior deputy probation officer, and the trial court found, in substance, that the commission had made a determination to that effect. Such determination was plainly within the bounds of its permissible discretion.

Next to be considered is the point that the examinations were invalid for the reason that the commission failed to make a "proper record of the examination, showing basis of rating," as required by charter and rule "when oral tests are used." (Art. IX, § 36; rule VII, § 3.) Such contention relates to the oral interview as part of the evaluation process—an "oral test" or "examination" conducted for the purpose of "rating" the candidates. But giving the quoted provision a fair and reasonable construction rather than a narrow interpretation inconsistent with the broad latitude and discretion conferred upon the commission in its field of operation, it does

not appear that the prescribed "record" was lacking here.

At the time of the oral interview, the examiner had before him the filed application of the candidate giving his complete personal history and the General Qualifications Appraisal Record form specifying the qualities which the commission deemed "necessary and important" considerations in his ultimate rating for the position to be filled. The candidate was interrogated only as to his education, experience, and matters bearing upon his personal fitness, and the examiner's findings thereon were recorded on the appraisal sheet according to the personal qualifications itemized for measure. Technical questions for the purpose of testing knowledge were not asked, but the whole purpose of the interview was designed for the ascertainment of personality factors which would affect the efficient discharge of the "duties and requirements" of the desired position. From this standpoint the precise questions and answers were not important to the efficacy of the interview, for the examiner as a trained personnel observer was endeavoring to gauge the personality and attitudes of the candidate as reflected in general pertinent conversation, which would permit rating on the traits designated for appraisal. The commission then translated the rating charted by the examiner into a numerical value, in accordance with a fixed formula and schedule, and such record of the candidate's evaluation was preserved in the event of challenge on appeal to the commission for a revision in rating. While it is true that such appraisal reflected subjective judgments, conclusions and impressions of the examiner as to the candidate's manner, conduct, appearance and allied considerations of personal fitness designated as having significant bearing on his probable competency and efficiency for promotion in the service, the detailed form of itemization of the base topics for grading may properly be classified as compliance with the prescribed "record . . . showing basis of rating." In view of the purpose of the oral interview and the particular factors entering into the completion of the examiner's appraisal according to the form detail, it is difficult to see how a more complete "record" of the "basis of rating" could be achieved without requiring a transcript or stenographic report of the entire oral proceeding. Since the latter type of record is not specified as determinative of the legality of an "oral test" under the language of the pertinent charter provision and rule above quoted, the term will not be so interpreted in derogation of the authority

of the commission to conduct this phase of the evaluation process and to make a "record" thereof adequate and in conformity with the practicalities of the situation in showing the "basis of rating" the candidate upon the approved personality factors.

In this connection and in further challenge of the validity of the oral interviews, it is argued that they did not satisfy the charter requirement of "open, competitive examinations" for testing the relative fitness of applicants for the position sought. (Art. IX, § 34(2).) Such contention is without merit, for a "competitive" examination simply envisages that it be "open" to *all* who are able to meet the minimum requirements for candidates (art. IX, § 34(5)), as distinguished from a mere qualifying examination for one or more picked candidates. (See Webster's New Int. Dic. (2d ed.), Unabridged, p. 545; 15 C.J.S. 662.) So pertinent is the following language in the case of *State ex rel. King* v. *Emmons,* 128 Ohio 216 [190 N.E. 468, at page 471], where a similar requirement contained in the state constitution with reference to the Ohio civil service law was before the court for interpretation: "What, then, is meant by 'competitive examination'? In a competitive examination, the candidates match their qualifications each against the others, and the final determination is made by rating and comparison. It is open to all who are eligible. In contrast, a noncompetitive examination is one in which the examining authority selects at pleasure such candidates as he may choose and subjects them to examination as he deems necessary." (See Words and Phrases (Perm. Ed.), vol. 8, pp. 253-254.) Consistent with these observations, the candidates for the positions here in question were all tested by oral interviews for the same personality factors—each candidate was pitting his personality traits against those of every other candidate incident to the examiner's process of making comparative evaluations—so that the ratings in consequence of such "open" contest may properly be said to rest on a competitive basis.

To be sure, there must be measurable standards established for determining the general proficiency of the candidates for the particular position, but the fact that such standards were subjective rather than objective does not prevent the classification of the "oral interview" as a "competitive" examination. The various aspects of the personality factors, as previously determined by the commission to be "necessary and important" to the position to be filled, were itemized for

consideration by the examiner as the measuring rod and guide-post in his evaluation process as to the personal fitness of the candidate, so that it cannot be said that there was no effective common criterion of base topics underlying the comparative ratings. In this connection, the New York cases cited as legal precedent in their discussion of the conduct of oral examinations pursuant to the constitutional requirement that appointments and promotions in the civil service "shall be made according to merit and fitness to be ascertained, so far as practicable, by examinations, which, so far as practicable, shall be competitive," merit careful analysis.

The first case to be noted is *Fink* v. *Finegan*, 270 N.Y. 356 [1 N.E.2d 462], where a civil service examination for the position of police surgeon and medical officer was declared void on the ground that the competitive quality required by the state Constitution was lacking because of the failure to employ objective standards in the oral phase. The candidate passed the written test but was failed on the oral examination consisting of technical questions of a medical nature, although he answered them correctly. As reason for his failure, the oral examiners reported that "although he was pleasant in manner and bearing and in comprehension fairly quick, he lacked force and executive ability, and was altogether too mild," and it was their unanimous opinion that he would "not . . . make an acceptable P.S. and M.O." (P. 463 [1 N.E.2d].) The candidate asked for a rerating, and in holding that he was entitled to further consideration, the Court of Appeals of New York undertook to lay down certain general limits as to the types of tests to be used and the conditions appropriate therefor. So it was said at pages 464-465 [1 N.E.2d] : "A test or examination, to be competitive, must employ an objective standard or measure. Where the standard or measure is wholly subject to the examiners, it differs in effect in no respect from an uncontrolled opinion of the examiners and cannot be termed competitive. . . . The oral test serves its purpose in a competitive examination. Obviously it may be employed as a test of knowledge. In addition, it may be used to test other qualities. . . . An examination cannot be classed as competitive unless it conforms to measures or standards which are sufficiently objective to be capable of being challenged and reviewed, when necessary, by other examiners of equal ability and experience. Some positions in the civil service may require that the person who fills them have certain qualities which

cannot be measured by existing objective tests. . . . In the case at bar, however, there has been no finding that executive ability and force are qualities necessary for the position, nor did the announcement of the examination reveal that these qualities would be tested . . . [The] examiners, without warning or notice, and without a finding by the commission that the qualities of force and executive ability are necessary for the positions . . . have eliminated the petitioner on the ground that he lacks these qualities. . . . The Civil Service Law and rules would seem to require that the commission prepare lists of preliminary requirements and subjects of examination and publish them with the notice of examination.''

From the above language it appears that the decision in the Fink case was based in part on the fact that while the candidate on the oral examination was questioned solely on technical medical questions, which he answered correctly, he nevertheless was failed thereon for other reasons which were not shown to be in any way material to the position. He had not been told, contrary to the situation here, that he would be graded on certain personality factors as previously determined by the commission to be ''necessary and important'' to the position to be filled, consistent with the advance bulletin announcing the examination to embrace two parts—a written test and ''an evaluation of . . . education, experience and personal fitness.'' Furthermore here, at the time of taking the written test, the candidates were informed that each part would carry a weight of 50 per cent in computing the total grade. But, in addition, it is significant that the Fink case recognized that some factors essential to the effective discharge of the duties of a particular position could not be ''measured by existing objective tests.'' This exception was emphasized in the *Matter of Sloat* v. *Board of Examiners,* 274 N.Y. 367 [9 N.E.2d 12, 112 A.L.R. 660], where the New York Court of Appeals sustained the legality of oral ''interviews'' and ''teaching'' tests given candidates for teaching positions in the public schools of New York City. It there appeared that the ''interview test'' was given, partially at least, to appraise the candidate's voice for carrying power, distinction, and freedom from defects of speech, and that the ''teaching test'' was devised to estimate the teacher's ability to maintain order in the class, enlist the interest of the students, and impart knowledge to them. After reviewing the precise ruling in the Fink case and observing that even there ''we took pains to point out

that we were not condemning, in advance, all oral examinations or tests where evaluation of results must depend in greater or lesser degree upon the opinion of the examiners,'' the court continued at page 15 [9 N.E.2d] as follows:

''. . . The mandate of the Constitution for the ascertainment of merit and fitness, so far as practicable, by competitive examination, may not be transformed into an interdict against the examinations which are best adapted for the demonstration of fitness. It would be impossible to formulate a standard by which such qualities may be defined or measured with entire objectivity. The law does not require the impossible or forbid the reasonable. The record discloses that here the examiners have based determination upon their estimates of qualities which, it is reasonably clear, affect the merit and fitness of a teacher and that this estimate is derived from tests calculated reasonably to show those qualities. Evidently it is not practicable to apply such tests in exactly the same form to each competitor or to make exact comparisons between them. That is true in some degree of every examination, especially of examinations calculated to show intellectual ability and broad cultural learning. Exact definition of the qualities which are essential or desirable may be impossible; exact formula or standard by which such qualities may be measured has never been achieved; mechanical application of any standard is certainly not practicable. Much must be left here to the judgment of the examiners. The test cannot be wholly objective and to the extent that it is subjective the result may depend as much upon the fitness of the examiners as upon the fitness of the candidate. That is a risk inherent in all systems of examination.''

In commenting upon the distinction between objective standards and subjective ratings as discussed in the Fink and Sloat cases, the court in *Bridgman* v. *Kern*, 257 App.Div. 420 [13 N.Y.S.2d 249], stated at page 257 [13 N.Y.S.2d]: ''The rationale of these decisions is that personality tests should employ objective standards so far as possible . . . [Where] objective examinations are not . . . possible . . . it should appear the tests are reasonably calculated to show merit and fitness and not merely to show the unfettered preferences or judgment of the examiners.'' And in *Farrell* v. *Kern*, 17 N.Y.S.2d 934, the factor of ''judgment'' was approved as a proper element in an oral test given under the New York City civil service law. After referring to the Sloat opinion for its

clarification of "some misconceptions which had arisen from certain expressions in the Fink case taken in their isolation" (p. 935), the court distinguished the case before it as follows, at page 936: "Here the Commission endeavored so far as possible to approximate a standard as distant from the mere subjective as the situation permitted in the circumstances. The qualities of fitness which it prescribed in advance for the oral test could not be satisfactorily evaluated by a mere anonymous written examination. The notes of the examiners showing the basis upon which they made their decision were available for review . . . To make more certain that the personal equation of the examiners would be minimized, four persons simultaneously conducted the oral examination, and they were not limited by any arbitrary restrictions in advance." Thus while it appears that the later New York decisions have not denied the substantial doctrine of *Fink* v. *Finegan, supra,* 1 N.E.2d 462—that an examination to be "competitive" envisages an objective standard of grading so far as possible (see, also, *Andresen* v. *Rice,* 277 N.Y. 271 [14 N.E.2d 65, 70] ; *Cowen* v. *Reavy,* 283 N.Y. 232 [28 N.E.2d 390, 392])—the practicalities of varying situations have been recognized as the basis for the relaxation of a rigid adherence to a narrow principle where the employment of subjective estimates would appear to be "best adapted" for the ascertainment of the "merit and fitness" of the respective candidates for the particular position in question. (*Matter of Sloat* v. *Board of Examiners, supra,* 9 N.E.2d 12; also, *Farrell* v. *Kern, supra,* 17 N.Y.S.2d 934.)

Consistent with this "practical" trend in the New York decisions, it must be recognized here that the commission reasonably concluded that the oral interview, as distinguished from a test of technical knowledge, was the most appropriate means for evaluating the candidate's personal fitness and appraising his possession of those traits or qualities which it had determined as "necessary and important" to the satisfactory discharge of the duties of the professional positions in question. Although the various qualities listed for rating by the examiner in determining the candidate's personal fitness were not defined with cumbersome detail, the standards and nomenclature were presumably well understood by the examiner in line with his particular training and experience in psychological measurements and rating techniques, so that a further breakdown of the terms would only appear an unnecessary refinement insofar as effecting any more uniform appli-

cation of grading the candidates. While the examiner's judgment on the designated criteria was of necessity subjective, it does not follow that such estimate lacked reliability and validity as a basis of selection. Manifestly, a candidate's personality and attitudes cannot be measured through the mechanical application of fixed standards in the course of an interview, but the pattern thereof must develop in part according to the individual being tested and the precise line of procedure will reflect the skill of the examiner in achieving an appropriate appraisal, including the "final evaluation" factor as a composite picture reflecting the end result of delicate weighing and balancing of the separate judgments on the personality factors. To require the examiner to make extensive notes of all his factual observations and relate the various mental processes by which he reached his ultimate conclusions would seem unnecessary, voluminous documentation that might very well impede the progress of the interview and rob it of much of its desirable flexibility. Each candidate was subject to a like type of oral interview in the general evaluation process, making the competition fair to all. As so analyzed, it would appear that the appraisal form completed by the examiner was as objective as "practicable" by reason of its focusing attention on the specific aspects of personality to be measured; and as a record showing the basis of rating by the examiner, it met the requirement of the charter and rule as an "open, competitive examination" within the discretionary bounds of determination by the commission. To minimize the effect of any personal background and experience on the part of the examiner that might operate to color his appraisal of a candidate, the latter was subject to two interviews by independent examiners and their findings were averaged together to give the rating on that phase of the examination.

Nor was the use of the confidential report of the department head improper as part of the evaluation of the candidate for promotion. It was a contemporary appraisal of the candidate's past performance in the service; and being based on personality factors which, as heretofore itemized, appear to have a valid relation to his readiness for promotion, it was as objective as practicable in listing the points for rating. It is obvious that a written examination could not, and the oral interview might not, reveal the traits of character and personal qualifications covered by such report from the department head. It was translated to numerical value, in accordance with a fixed formula, and it constituted but 25 per cent of the

evaluation phase of the examination. Its confidential character was apparently in line with an effort on the part of the commission to insure accuracy and avoid any personal embarrassment that might result from the publication of an unsatisfactory report. The same procedure prevailed with respect to each candidate. As an added record for the ascertainment of "relative fitness" of the candidate for discharging the "duties and requirements" of the position to be filled, the desirability of the procurement of such report was a matter for determination by the commission within the exercise of its discretion.

Unquestionably, the ascertainment of fitness and merit for office is the primary objective of the civil service system, and a competent procedure for promotion is an essential part thereof. It has a twofold purpose—"to abolish the so-called spoils system" in. the matter of appointment in the service and "to increase the efficiency" of employees therein "by assuring [them] of continuance in office regardless of what party may then be in power" together with the opportunity "for promotion to higher positions when vacancies occur [as] the reward of faithful and honest" work. (*Allen* v. *McKinley,* 18 Cal.2d 697, 705 [117 P.2d 342].) Accordingly, the examinations must be according to standards making the competition fair to all; but within this general limitation the commission, in working out the problem of measuring the candidates' suitability for the position to be filled, should not be proscribed in adopting a method of selection which it deems best calculated to produce the desired result. (*Nelson* v. *Dean, supra,* 27 Cal.2d 873, 881.) It cannot be disputed that in private business both oral interviews and references from past employers play an important part in job placement. The same line of inquiry as to "education, experience and personal fitness" should be open to the commission to secure the best functioning of the civil service system, so long as (1) the safeguard of recognized standards is provided to insure the candidates a uniform basis of rating so far as possible consistent with the subjects determined as appropriate for examination, and (2) a record showing the basis of rating is made. So here, the commission adopted an overall method of testing which appears valid and acceptable in equality of treatment of the candidates and the assessment of comparative ratings under the charter and rule requirement of an "open," "impartial" and "competitive" examination—with a relative weight of 50 per cent given the written part and a like percentage allowed for the various personality factors entering into the

evaluation process. (*Cf., Cowen* v. *Reavy*, 283 N.Y. 232, *supra*, 28 N.E.2d 390, 392; *Rosenstrauch* v. *Reavy*, 174 Misc. 446 [21 N.Y.S.2d 358, 362].) The conduct of the oral interviews was entrusted to two experienced examiners, presumably impartial in their rating technique as required in the performance of their official duty (Code Civ. Proc., § 1963, subd. 15); and the department head's confidential report, a logical and contemporaneous reference in ascertainment of a candidate's merit for promotion, was still not given an undue weighting in the overall measure, since it figured but 25 per cent of the total grade allowed for the evaluation phase of the examination. All of these papers were preserved as a record of the examination showing the "basis of rating" in the event of a candidate's appeal pursuant to the rules of the commission. Although the evaluation record did not detail the mental processes by which the examiners or the department head arrived at their respective ratings, enough detail was presented for adequate review consistent with the practicalities of inquiry into personality factors affecting an integral part of the ascertainment of a candidate's ability to perform the "duties and requirements" of the position to be filled. The propriety of such evaluation process coincides with the trend of the New York decisions, as above reviewed, recognizing "practical" considerations in competitive methods of personnel selection for the civil service system.

In determining the problem of the validity of the two promotional civil service examinations here in question, it must be remembered that petitioner does not claim that there was any arbitrary, fraudulent, or capricious action on the part of the commission, or any person acting on its behalf, in the conduct of the examinations, but confines his objections solely to the propriety of the method of procedure adopted by the commission for testing the candidates. In view of the conclusion that the examinations as prescribed by the commission were appropriate to the competitive selection of civil service personnel, and in the absence of any charge or showing that the commission, or anyone acting in this matter, proceeded otherwise than honestly and in good faith in the evaluation process, petitioner cannot prevail in this mandamus proceeding.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.