[Civ. No. 15805. First Dist., Div. Two. June 30, 1954.]

ITALO AMERIO et al., Respondents, v. CITY AND COUNTY OF SAN FRANCISCO et al., Appellants.

Dion R. Holm, City Attorney, and William F. Bourne, Deputy City Attorney, for Appellants.

Irving Schoenfeld for Respondents.

DOOLING, J.—This is an appeal from a judgment entered in a proceeding for injunction and writ of mandate. The judgment commanded appellants to abandon their announced intention of holding an open examination for the civil service position F 50 Maintenance Chief, San Francisco Airport, and commanded appellants to hold a promotional examination from the class F 52 Crew Chief for such position.

Appellants are the City and County of San Francisco and more particularly the members of its civil service commission, and respondents are civil service employees assigned to positions at the San Francisco International Airport. Five of the respondents are assigned to positions in the civil service classification F 52 Crew Chief and the rest are assigned to the civil service classification F 51 Airport Attendant.

The charter charges the civil service commission with the duty of providing qualified persons for appointment to the service of the city and county (charter, § 140). Under section 141 of the charter the civil service commission shall adopt rules governing examinations. Acting under this authority the commission set up an open examination to commence on October 5, 1951, for the position F 50 Maintenance Chief, San Francisco Airport. There is only one such position in that class at the airport.

The minimum requirements necessary in order to be eligible for the examination were published by the commission some time prior to the examination. The pertinent ones in this appeal are:

"(a) Five years first-class paid experience within the last eight years in general construction work, at least one year of which must have been in a supervisory capacity; or

"(b) Three years first-class paid experience within the last eight years in construction work or maintenance operations

which must have included grading and construction of roads and/or runways, and/or maintenance and operation of such installations and of various construction equipment, such as trucks, rollers and power blades, at least one year of which must have been in a supervisory capacity.

"*Note*: Completion of at least two years of a basic engineering course in an institution above the high school level may be substituted for one year of the non-supervisory experience required under (a) or (b)."

The civil service commission's classification of duties manual was introduced into evidence. It contains the following statements of duties with regard to the F 50 and F 52 classes:

"F 50 Maintenance Chief, San Francisco Airport: Under general direction: supervises the maintenance of all airport and air navigational facilities, including runways, taxiways, roadways, parking and turf areas, utility services, drainage systems, levees, automotive and maintenance equipment, fire apparatus, lighting facilities, etc.; directs the work of subordinates; requisitions materials; supervises maintenance of stores and supplies; performs inspections; prepares required reports; and performs related duties as required.

"F 52 Crew Chief, San Francisco Airport: Under direction: during an assigned tour of duty, is in full charge of airport ground facilities; supervises subordinates; is responsible for inspections and operating conditions of airport air-navigational facilities and proper marking of hazards; prepares and distributes to airmen for the manager notices regarding current field and lighting conditions as required by federal regulations; prepares accident and equipment reports; inspects and supervises operations and assists in maintenance of fire equipment; directs extinguishment of fires; operates equipment; enforces federal aeronautical and airport rules; and performs related duties as required."

One of the rules of the civil service commission is that experience gained by a civil service employee by virtue of work done which is not within his classification, as such duties of his classification are prescribed in the official duty statement for his class, cannot be recognized on the question of his qualification to take an examination for another position, and none of the respondents working as crew chiefs met the minimum requirements for the job of maintenance chief as laid down by the commission.

The crew chiefs testified that they were thoroughly familiar with airport maintenance and with the duties of maintenance

chief as performed by Mr. Sweet. The trial court found that all the crew chiefs are qualified to perform the duties of maintenance chief and therefore it is practicable to fill this position by means of a promotional examination.

As outlined above, the city charter grants the commission the power to determine the method of appointments and the rules governing promotions. Section 146 applies to promotions and the pertinent part reads as follows: "Whenever it deems it to be practicable, the civil service commission shall provide for promotion in the service on the basis of such examinations and tests as the commission may deem appropriate and shall, in addition, give consideration to ascertained merit and records of city and county service of applicants. . . ."

Respondents rely on two companion cases: *Allen* v. *McKinley*, 18 Cal.2d 697 [117 P.2d 342] ; *Rhodehamel* v. *Civil Service Board*, 18 Cal.2d 709 [117 P.2d 349]. Both these cases held that the commission abused its discretion in failing to give a promotional examination. The Allen case arose from San Francisco and involves the identical charter provision that applies here. The Rhodehamel case came up from Alameda County and involves a substantially similar section found in the Oakland City Charter. The court held in the Allen case that "Section 146 of the charter constitutes a limitation on the discretion of the Commission. Where it is practicable to hold a promotional examination, such examination must be given. In determining whether it is practicable to give such an examination the Commission has not an uncontrolled discretion. If such an examination is not to be given, a valid reason why not, must exist. When the Commission's action is challenged, and the petitioner produces a prima facie case that a promotional examination is practicable, the burden is on the Commission to justify its action."

There is an important distinction that can be made in the facts of the two cited cases, and the case before this court. In the Allen and Rhodehamel cases it was conceded that the petitioners were fully qualified to take the examinations and the court held that this showed that it was practicable to hold a promotional examination, but here both sides agree that petitioners cannot qualify for the examination under the minimum qualifications set out by the commission. Therefore, the real issue before the court is not whether the commission abused its discretion in providing that an open examination be given but whether it abused its discretion in fixing the minimum qualifications that must be met to be

eligible for the examination. The determination in the first instance is one delegated by the charter to the civil service commission and its determination is conclusive on the courts in the absence of "a showing of arbitrary, fraudulent, or capricious conduct, or a clear abuse of discretion." (*Almassy* v. *Los Angeles County Civil Service Com.*, 34 Cal.2d 387, 396 [210 P.2d 503]; *Nelson* v. *Dean,* 27 Cal.2d 873, 881 [168 P.2d 16, 168 A.L.R. 467]; *Maxwell* v. *Civil Service Com.*, 169 Cal. 336, 338-339 [146 P. 869].)

The duties of the occupant of the position of maintenance chief at the San Francisco Airport were described by Mr. Dixon, manager of the airport, as follows:

"The maintenance chief of the San Francisco Airport is responsible for the maintenance and upkeep of a $37,000,000 plant. It will be a $50,000,000 plant in two years. We have a network of utilities, meaning sewage systems, water mains, gas lines, electrical lines, high intensity light system which represents some 12 miles of lighting, about 6 miles of runways, about 4 miles of taxiways, and probably 8 or 10 miles of roads, two large drainage pumping units, one at the south end of the field and one at the north end of the field, capable of putting out 160,000 gallons a minute. That gives you some idea of the size of it.

"We have another power plant in the Pan American area. We have a standby generating unit, to take care of the high intensity lights, in the event of a power failure. Carpenter work, plumbing work, the observing and taking care of signs, ordering of materials, laying out of specifications for contractor work that may become necessary, and, above all, the laying out and assigning of specific work to be done by the personnel under him."

Mr. Dixon also testified concerning the qualifications that one should have to occupy this position: "What we are looking for is a person who has the necessary background and qualifications to take care of a terrific facility, a $50,000,000 establishment. We have millions of dollars of utilities. It is the fourth largest operation in the United States and we are merely looking for a person who is capable and qualified to take over and assume the responsibilities as a maintenance chief of a terrific utility, one of the largest in San Francisco. That is what we are looking for.

. . . . . . . . . . . .

"I would say a maintenance chief at a facility such as the San Francisco International Airport, where you have some

six miles of runways, some four or five of taxiways, ten miles of roads, approximately, a high intensity light system around all of the runways, two standby generator units, two large pumping plants for drainage purposes, drainage canals around the whole facility, tank farm pipeline facilities, that a person at least should have some knowledge and background of knowing when and how to cause preventative maintenance, issue instructions to take care of the necessary repair work of those utilities and be qualified to work up a preliminary work order to accomplish certain types of work that would be required in the various utilities. He should have sufficient knowledge to formulate a proposed budget. He should have sufficient knowledge to program his work so as to take care of any preventative maintenance that becomes necessary in an establishment of that size.''

Mr. Turner, Manager of Utilities for San Francisco, under whose general jurisdiction the operation of the airport falls, testified: ''We view the airport as a small city of 10,000 population. It has all the problems of a small city: Water supply, power supply, sewage disposal, drainage, streets and roads and runways, and buildings and structures of all nature, fire protection, and it has all the problems. The maintenance chief is more or less the superintendent of the works department. . . . Your maintenance chief is the top supervisory person in full charge of the crew chiefs, and the crew chiefs work whenever the particular duties fit into that category. However, he also directs the work of and supervises the activity and controls the time of many other classifications, craftsmen of every nature employed at the airport.''

Mr. Henderson, Personnel Director and Secretary of the Civil Service Commission, gave the following testimony:

''Q. Do you know the reasons why the Commission deemed it impracticable to conduct a promotional examination? A. Yes, sir.

''Q. And will you tell me what they were? A. Well, we will have to go back to the duties and responsibilities of the various classifications of employment and compare those in relation to the duties and responsibilities of the job of maintenance chief; and that is what, first, the staff did, and, secondly, what the Civil Service Commission did. In other words, the staff made a recommendation to the Civil Service Commission on this matter and the Commission reviewed the recommendation and acted upon the recommendation. Now, we did consider the advisability or practicability of a promotional examination,

and in those considerations the one class which was considered was the class of crew chief; but a comparison of the duties of a crew chief with those of a maintenance chief led us, the staff and the Commission, to believe—and that was concurred in by the Commission—that the duties and responsibilities and training experience required of a crew chief did not constitute the training ground, shall we say, for promotion to the rank of maintenance chief. In other words, the Commission felt that the maintenance chief was charged with important maintenance and repair responsibilities and airport areas, airport buildings, landing fields and installations, and the crew chiefs didn't have that responsibility. For that reason, the Commission announced, after going over the reports and recommendations and after hearing the matter two or three times, decided that it was impracticable to hold a promotional examination because there was no classification in the service which provided the proper training and experience for the performance of these duties of maintenance chief.

.    .    .    .    .    .    .    .    .    .    .    .    .

"The duties of this position, as we have understood it and as it was outlined here this morning, is that this man is responsible for the general maintenance of the structures and the installations down there, which involves planning the repairs, the inspection of the installations, the planning of precautionary maintenance work, estimating cost of work to be done, estimating the amount of materials to be used on a job, and he prepares plans and specifications and orders materials for the jobs and so on.

"Now, that is vastly different from the routine maintenance, day-to-day maintenance work which may be performed by the airport attendants or crew chiefs, as we see it.

.    .    .    .    .    .    .    .    .    .    .    .    .

"The Commission felt that the duties of the crew chief were not sufficiently similar to those of the maintenance chief to qualify them for promotion to that rank.

.    .    .    .    .    .    .    .    .    .    .    .    .

"What we are really looking for is a man who has had experience in construction work and in the maintenance of heavy installations. . . . It is a job superintendent, really. We call it maintenance chief. Mr. Dixon referred to him as maintenance supervisor or maintenance superintendent. It is all one."

Specifically referring to the crew chiefs at the San Francisco Airport and the reasons for the determination that it

was not practicable to hold a promotional examination among them for promotion to maintenance chief, Henderson testified: "As I attempted to set forth a little earlier, this maintenance chief job is somewhat broader than being able to ride a bulldozer or caterpillar tractor or scraper or go out and change a light. It involves the planning of installations of that sort, the general repair and overhauling of such installations, the knowledge of how to calculate and estimate the cost and materials required and all that sort of thing. These gentlemen haven't done that. But a general construction man has; he has had supervisory experience."

■ Inherent in every determination of the question whether a promotional examination for a particular position is practicable is the question, as stated by the Supreme Court in *Rhodehamel* v. *Civil Service Board, supra,* 18 Cal.2d at p. 717: "The real question is whether the duties of the inferior position are such that they reasonably prepare the employee for the superior position." The appellant, civil service commission, determined in this case that the duties of crew chief were not such as to reasonably prepare such employees for the position of maintenance chief. The reasons for this determination are found in the testimony herein set out. We have quoted this testimony more extensively than might ordinarily be done in an appellate court opinion because of the trial court's conclusion that there was no reasonable ground to support the determination of the civil service commission that a promotional examination was not practicable. We are satisfied that the facts disclosed by this evidence furnish a reasonable basis for the determination of the civil service commission and: "Where the position is one as to the proper mode of filling which there is fair and reasonable ground for difference of opinion among intelligent and conscientious officials, the action of the commission should stand, even though the courts may differ from the commission as to the wisdom of the classification." (*Pratt* v. *Rosenthal,* 181 Cal. 158, 163-164 [183 P. 542].)

■ Some point is made of the fact that since the retirement of Mr. Sweet, the previous maintenance chief, the position has been filled under temporary appointments by several of the crew chiefs. This was explained as being an emergency measure. That it does not demonstrate that these crew chiefs are fully qualified to act as maintenance chief is shown by the testimony of Dixon:

"Q. Now, do I understand . . . that these temporary

occupants have not held down the job in the same way as Mr. Sweet did? A. Not fully, that is correct.

"Q. Now, in what respect have they not? A. Well, in the respect of determining the project that should be done with reference to whether or not the particular utility job should be done now. . . . In other words, the work was programmed by some one else. . . . What Mr. Sweet did was program the necessary work to be done and daily or weekly he would assign personnel to do that particular job. . . .

"Q. Would your comparison of the temporary occupants of the job and Mr. Sweet be that Mr. Sweet was more efficient in carrying out his duties? A. Well, I would say that he was more efficient in programming and laying out the work to be done.

"Q. Since his departure, has it been necessary to send more work orders into the maintenance section than was necessary when Mr. Sweet was there? . . . A. Yes."

We are satisfied that under the evidence no abuse of discretion was shown in the civil service commission's determination here under review.

Judgment reversed.

Nourse, P. J., and Kaufman, J., concurred.