[Civ. No. 17775.   First Dist., Div. Two.   Mar. 26, 1958.]

GERALD F. MURPHY et al., Appellants, v. FRANCIS P. WALSH et al., Defendants and Respondents; CLARENCE ROSENSTOCK et al., Interveners and Respondents.

Molly H. Minudri for Appellants.

Dion R. Holm, City Attorney (San Francisco), and William F. Bourne, Deputy City Attorney, for Defendants and Respondents.

M. Mitchell Bourquin for Interveners and Respondents.

BRAZIL, J. pro tem.*—Petitioners appeal from a judgment denying their application for a writ of mandate to annul a portion of a civil service promotional examination taken by them for the position of assistant fire chief and refusing to enjoin the respondents from certifying an eligible list for that position compiled as a result of that examination. An eligible list is in effect for only four years. Although the certification of the list is now four years old, the questions involved in this appeal are not moot because of the rights of the interveners, the two highest on the list, who have occupied the advanced positions during all this time as a result of the examination which is being questioned. The problems with which this appeal is concerned are also of a continuing or recurring nature and of prospective interest to the commission and future applicants.

The Charter of the City and County of San Francisco, in section 140 thereof, establishes a civil service commission, charged with the duty of providing qualified persons for employment in the many departments of the city. Job appointments must be made solely upon merit and fitness as established by appropriate tests. The next section provides that the commission shall adopt rules to carry out the civil service provisions of the charter which rules, together with applicable charter sections, govern all examinations and promotions. Rules made under such a power have the force and effect of law, so long as they are reasonable and within the fundamental principles of the charter provisions. (10 Cal.Jur.2d 438.)

Pertinent parts of section 145 are: ". . . The commission shall control all examinations and may employ suitable persons in or out of the public service to act as examiners. The

---

*Assigned by Chairman of Judicial Council.

tests may be written, oral, mechanical or physical, or any combination of them, practical in character and related to matters fairly to test the relative capacity of the applicants for the positions to be filled. The commission shall be the sole judge of the adequacy of the tests to rate the capacity of the applicants to perform service for the city and county. . . ."

An amendment to the charter adopted by an election in 1940 makes an exception to the provisions of section 145 with relation to promotive examinations in the police and fire departments. We are here concerned with a promotive examination in the fire department. The amendment is now section 146, which provides: "Whenever it deems it to be practicable, the civil service commission shall provide for promotion . . . on the basis of such examinations and tests as the commission may deem appropriate. . . . All such promotive examinations in the police and fire departments shall be entirely of a written character, and all questions asked or problems given in said examination shall pertain to matters concerning the duties of members of the department for which the examition is held."

The petitioners allege that the respondents acted arbitrarily, capriciously and in abuse of discretion and without regard to the provisions of section 146. At the trial and on appeal, petitioners have enlarged the scope of their complaint to include failure of the commission to follow its own rules in the conduct of the examination and in the matter of allowing protest of key rating factors or results.

On August 21, 1953, the commission prepared and issued an official announcement of a promotional examination in the class H-50 Assistant Chief of Department; which included a statement of duties of the position and the scope of the examination. The examination was held November 4, 1953. It was divided into two parts, the first being only true or false questions upon which the participants could receive a maximum 550 points out of a total of 750. No complaint is made about the content or the manner in which the first part of the examination was conducted.

The second portion, in which the controversy centers, is as follows:

"QUESTION 1—WEIGHT 150 POINTS

"Discuss and give your views on:

Improvements you would recommend in the present fire-fighting equipment to increase efficiency.

"NOTE: Discussion should be confined to a maximum of 500 words."

## "QUESTION 2—WEIGHT 50 POINTS

"A bonded indebtedness in the sum of $1,500,000 for the construction of new fire houses is to be submitted to the voters of San Francisco at a special municipal election to be held on December 1, 1953.

"Prepare a five-minute radio script requesting public support of the bonds."

Part II was prepared in this manner: "Instructions: the purpose of this part of the examination is to test your ability to analyze a situation, organize your thoughts and to develop a written statement in a clear and logical manner. The soundness and clarity of your reasoning is as important as is any factual knowledge presented. Your approach and the organization of your statement, as well as its substantive content, will be considered in grading this part of the examination."

The commission's rules for the conduct of an examination provide for rating key answers to be available for inspection of participants for three days before the examination papers are graded. With the multiple choice questions of the first part, this was done; but with the essay type questions of the second part key answers were not made available. Instead key rating factors were made available after the papers were graded and a tentative eligible list was posted. The rating factors used for the second part problems, were made up after a consideration of the essays written by all the participants. What all the participants had to say on the subject formed the basis of the rating factors. A period of protest and counter protest was allowed for about four weeks after the rating factors were made available and before the final list of eligibles was determined.

In one long sentence of their brief, appellants list their grievances under a general heading that the court erred in refusing to admit evidence that the commission acted arbitrarily, capriciously, in abuse of discretion and in violation of the charter. Each complaint of that sentence will hereinafter be given separate consideration. The trial court at the start of the case suggested an offer of proof from petitioners, and after it was made sustained respondents' objection thereto. Nowhere in the offer was there any suggestion that petitioners sought to prove favoritism, fraud or dishonesty on

the part of anybody. The court received in evidence the charter provisions, rules of the commission, the written examination and related matters, and the rating factors or criteria used in grading Part II of the examination.

Before examining the complaints of the petitioners it is well to have in mind the basic rules that guide the courts in a review of the conduct of a civil service commission in the conduct of an examination.

■ "The commission has wide discretionary powers in many of its fields of operation. However, such commissions have only such powers as are conferred upon them. When they exceed or abuse their powers it is not only within the power, but it is the duty of the judicial branch of the government to prevent such excess or abuse upon the petition of those adversely affected." (*Allen* v. *McKinley*, 18 Cal.2d 697, 705 [117 P.2d 342].)

■ "Moreover, with particular reference to the administration of civil service, it is the policy of the courts of this state that 'Courts should let administrative boards and officers work out their problems with as little judicial interference as possible. . . . Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere' (citations)." (*Nelson* v. *Dean*, 27 Cal. 2d 873, 881 [168 P.2d 16, 168 A.L.R. 467].)

■ ". . . the Civil Service Commission has been given broad discretionary powers in determining the subjects of examination and the qualifications which are to be measured (citation). Judicial interference under such circumstances is unjustified except on a showing of arbitrary, fraudulent, or capricious conduct or a clear abuse of discretion (citation)." (*Wilson* v. *Los Angeles County Civil Service Com.*, 103 Cal.App.2d 426, 432 [229 P.2d 406].)

"There are many decisions involving *mandamus* and its application, but none has been presented in the briefs, nor have we been able to find one, where a court employed *mandamus* to pass upon answers in an examination held by any board or commission authorized to hold such an examination," and ". . . analysis shows a marked uniformity of decision on the part of courts to leave examinations in the hands of members of boards to whom they have been entrusted." (*Mitchell* v. *McKevitt,* 128 Cal.App. 458, 462, 465 [17 P.2d 789].)

The particulars of petitioners' general complaint, that the court refused to receive evidence to prove capricious, arbi-

trary or unlawful conduct are set forth as quotations from the brief at the beginning of each paragraph.

"It refused the petitioners the right to put on evidence showing that the key answers to Part I of Question II of the examination did not conform to the question itself."

■ It is not for a court to second guess the conductors or examiners on the accuracy of the answers. "Much must be left here to the judgment of the examiners. The test cannot be wholly objective and to the extent that it is subjective the result may depend as much upon the fitness of the examiners as upon the fitness of the candidate. That is a risk inherent in all systems of examinations." (*Matter of Sloat* v. *Board of Examiners,* 274 N.Y. 367 [9 N.E.2d 12, 112 A.L.R. 660], cited with approval in *Almassy* v. *Los Angeles County Civil Service Com.,* 34 Cal.2d 387, 401 [210 P.2d 503].)

■ "Refused the appellants permission to call as witnesses experts and grammarians . . . to assist the court in the meaning of the words used . . . to show that the key answers did not conform to the questions propounded."

The obvious answer is that the examination was not given for experts and grammarians but for firemen who wanted to be promoted to assistant fire chief. Words mean what people generally understand their meaning to be. A dictionary is only a compilation of what words sounds mean to the greatest number of people ordinarily using the words. The trial judge was in as good a position as the experts or grammarians to determine what meaning the hopeful applicants would ascribe to the words, alone or in their context, which were used in the instructions and the questions or problems.

■ "Refused permission to call witnesses to show that radio script writing was not a duty of H 50 Assistant Chief."

There was no need for such evidence for all agree that script writing is not part of an assistant chief's duty. Section 146 of the charter does place a limit on the kind of question or problem that can be propounded—it must pertain to matters concerning the duties of the department for which the examination is held. It is for the commission within its broad discretionary powers to first decide what question or problem pertains to the duties of the position, considering the rule that the commission's exercise of its discretion will not be upset in the absence of clear abuse. It is not unreasonable to find that the problem involved in Question II is not one of radio script writing but one which involves its topic. The subject matter of the suggested script does pertain to the

duties of the position to be filled. The suggested method of answering the problem is but a short illustration of the form the answer to the problem should take. The attributes of a radio script can well be adapted to the making of reports either within the department or to the public in the interest of an efficient administration of a fire department. It must be remembered that petitioners were seeking to qualify for one of the highest positions in a very large fire department. Among other duties of an assistant chief, was that of taking over as chief of the entire department should occasion ever require. It is reasonable to expect a person in such high position, to be able to communicate well and forcibly, with the men in the department or with the general public.

■ "Refused to permit the appellants to call as a witness the employee of the Fire Department in charge of equipment to show the equipment in the Fire Department at the time of the examination."

Appellants' contention here is based upon their interpretation of the word "Improvements" contained in Question I. They say the word can only relate to existing equipment, and cannot include within its meaning additions to or purchases of equipment. The key rating factor includes purchases and additions to present equipment as an improvement in present fire-fighting equipment. The court cannot substitute, if it would, a different rating factor, for it is apparent that the commission's interpretation is not unreasonable. Additionally, it should be noted that the interpretation is that which the majority of applicants thought it meant, for the rating factor is based upon the answers they all gave to the problem.

■ "It refused to permit the petitioners to present to the Court as witnesses under section 2055 of the Code of Civil Procedure the expert consultants who aided the Civil Service Commission in this examination so as to show their true function."

What useful purpose this line of questioning would serve has not been shown by appellants and it is not apparent. Section 145 of the charter gives the commission the authority to hire, even outsiders, to help in giving the examination.

■ "[A]nd the fact that the key answers were set up after the examination was held and the papers graded, rather than prior to the examination as provided in Rule 12 of the Civil Service Commission."

Rule 12 is far too long to quote verbatim, but in part it

reads: "Prior to the rating of the examination papers, the questions asked in the written examination and the rating key answers will be available for three days. . . . The purpose of this inspection of rating key answers is to correct any errors in the rating key answers or any of the questions asked in the examination that may be ambiguously or incorrectly phrased; therefore, protests by participants must be filed in writing during this rating key inspection period." First it should be noted that rule 12 is limited to "questions" leaving a reasonable inference that it does not apply to "problems." Although labeled questions, the two parts of Part II are in fact not questions at all but are in the nature of problems requiring an essay as a proper answer. Section 146 of the charter refers to both questions and problems which must be in writing.

There was evidence introduced on this last subject from the secretary of the commission who testified that the rating factor for an essay type question was not posted until the papers were graded for there was no fair or practical way of getting the proper rating factor until all the examination papers were read. To such a question there is no definite wrong or right answer, such as there is in a multiple choice question, from which a key answer can be made up before the grading. What all the participants have to say about the problem forms the basis upon which the rating criteria are based. A rating factor made up in advance of answers by participants, might find all answers way below par, or find answers which were better than that which had been set up as 100 per cent. The witness stated that this procedure had always been the administrative interpretation of the rules regarding rating keys or rating factors.

▉ "And in order to show that participants were denied the opportunity to protest timely and prior to the adoption of the tentative list."

There was no limitation in the trial court in presenting evidence on this point even though there was and is doubt as to whether or not it was a proper issue before the court under the pleadings. The court found that there was substantial compliance with all the applicable rules of the commission relating to protest. Appellants have not shown wherein this finding is not justified from the evidence. It was found that the commission did not rate factors for Part II until after the papers were graded and a tentative list of eligibles had been prepared; that the rating factors were posted February

19, 1954, that although all petitioners entered protests, none did so on the ground of failure to post rating factors before grading. The protests were heard by the commission at a regularly noticed hearing and as a result thereof two of the petitioners were upgraded five points each, which, however, did not change the result in their cases. With the exceptions noted all protests were denied.

■ The civil service examination was a competitive examination, held to create an eligible list for vacant positions. The applicants are in fact in competition with each other, for the vacancies are filled only from among those who take the examination, with the one getting the highest mark being entitled to the first vacancy and so on down the line until all are filled. It is not the same as an entrance examination where to be successful, a participant must receive a passing grade which is dependent upon a standard of excellence predetermined by a board of examiners. The important thing in an entrance examination is to get a passing grade; in a civil service promotional examination it is important to get a better grade than anybody else.

Judgment affirmed.

Dooling, Acting P. J., and Draper, J., concurred.